**Larry Gene GRAHAM, Petitioner,**

v.

**STATE of Tennessee, Respondent.**

Supreme Court of Tennessee.

Jan. 31, 1977.

Rehearing Denied Feb. 28, 1977.

Thomas A. Harris, Chattanooga, for petitioner.

Tennessee Association of Crim. Defense Lawyers, Jerry H. Summers, Chattanooga, for amicus curiae.

R. A. Ashley, Jr., Atty. Gen., David L. Raybin, Asst. Atty. Gen., Nashville, John Goza, Jerry S. Sloan, Asst. Dist. Attys. Gen., Chattanooga, for respondent.

## OPINION

HENRY, Justice.

We granted certiorari in this criminal action to consider four significant questions, viz:

a. The right of an indigent criminal defendant, pleading not guilty by reason of insanity, to a psychiatric examination at state expense.

b. The admissibility of hospital records under the Uniform Business Records as Evidence Act (Sections 24–712—24–715, T.C.A.) in a criminal action.

c. The correct test for determining the question of criminal responsibility.

d. The correct jury instruction with respect to the burden of proof in criminal prosecutions wherein insanity is pleaded as a defense.

## I.

### Factual Background

Petitioner was convicted of bank robbery, grand larceny and assault with intent to commit murder. All convictions grew out of a bizarre series of events that occurred in the Chattanooga vicinity on 14 October, 1974.

Petitioner, a twenty-eight (28) year old man, with a history of mental disorders, marital difficulties and occupational problems, was residing in Chattanooga with his parents. He had been married and was the father of five (5) children. The record suggests his wife's infidelity; and that she lost her life in an automobile wreck while out with other men. The children ultimately were placed in a foster home by the Tennessee Department of Public Welfare (now Department of Human Services).

He had been treated in the psychiatric ward of Baroness Erlanger Hospital from May 19, 1973 to June 19, 1973, with diagnosis of "paranoid state", followed by treatment at Central State Psychiatric Hospital. He was again treated at Baroness Erlanger from February 15, 1974 to February 19, 1974, for the same malady, followed by treatment at Moccasin Bend Psychiatric Hospital.

On 14 October 1974, he went to the office of Dr. J. S. Cheatham, who had treated him while a patient at Baroness Erlanger, but the doctor was out. After leaving the doctor's office, he purchased and consumed a half pint of whiskey. It should be noted that petitioner was a problem drinker if not an alcoholic.

Thus fortified he began his foray. First he went to a hardware store located in the vicinity of his home, where his father formerly worked, where he normally traded, and whose owner had known him for many years. There, in plain view, after pricing a shotgun, he took the gun and two boxes of shells and openly and slowly walked out of the store with them.

Next he went to a service station where he was known by one of the attendants and, after being refused credit, brandished the stolen shotgun and ordered the attendant to fill up his automobile. After the attendant complied, he sped off before the cap could be replaced on the gasoline tank. But, as he left he "throwed out a billfold" containing full identification.

He then drove out to the Red Bank branch of Hamilton Bank where he entered the banking room and, without mask or other disguise, robbed a teller of approximately $2400.00, sauntered out and drove off at a normal rate of speed.

By this time the police had been alerted and ultimately he was pursued by a policeman. He stopped his car and the police car stopped behind him. As the policeman got out of his car petitioner shot and wounded him, rolled him over to the side of the road, and kicked him a few times. He then took charge of the police car and drove it around for a short time with the blue light flashing and rotating. He returned, got back in his own car, and started toward Dayton. He surrendered to the Rhea County Sheriff in the vicinity of Graysville. Subsequently, he made a full confession.

Petitioner's sole defense was not guilty by reason of insanity.

After his conviction he appealed to the Court of Criminal Appeals and that Court

affirmed the verdict of the jury and the judgment of the trial court thereon.

No assignment challenges the sufficiency of the evidence. Indeed, the petitioner, testifying in his own behalf, admitted each offense. The sole issues before the Court are those hereinabove set forth.

## II.

### Right to Psychiatric Examination

■ Prior to the trial petitioner's court appointed counsel [1] moved the Court for an examination by a private psychiatrist, at State expense. The trial judge's denial of this motion forms the basis of petitioner's first assignment in this Court.

There is no statutory predicate for the appointment of a private psychiatrist. Section 33–708(a), T.C.A., provides as follows:

When a person charged with a criminal offense is believed to be incompetent to stand trial, or there is a question as to his mental capacity at the time of the commission of the crime, the criminal or circuit court judge before whom the case is to be tried may, upon his own motion or upon petition by the district attorney general or by the attorney for the defendant and after hearing, order the defendant to be evaluated on an outpatient basis by the *community mental health center* designated by the commissioner to serve the court or, if the evaluation cannot be made by the center, on an outpatient basis by the *state hospital* or the state supported hospital designated by the commissioner to serve the court. If in the opinion of those performing the mental health evaluation, further evaluation is needed, the court may order the defendant hospitalized, and if in a *state hospital* or *state supported hospital,* in the custody of the commissioner for not more than thirty (30) days for the sole purpose of further evaluation. (Emphasis supplied).

It will be noted that the statute is discretionary, since it in no sense requires such an examination, nor does it specify that the examination be conducted by a psychiatrist as opposed to a psychologist,[2] nor does it contemplate the employment of a private practitioner.

Since there is no statutory sanction for the employment of a private psychiatrist at state expense, we look to case law for precedent. Our investigation into the law leads us to the conclusion that this is an area wherein the law has not been fully and finally settled. There is an apparent cleavage, with no qualitative or quantitative preponderance. See annotation, *Right of Indigent Defendant In Criminal Case to Aid of State by Appointment of Investigator or Expert,* 34 A.L.R.3d 1256, and more particularly, sections 6(c) and (d).

Pertinent to the issue is the rationale of *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), wherein the Court was dealing with the due process right of an indigent defendant to a second tier appellate review. There the Court said:

The Fourteenth Amendment "does not require absolute equality or precisely equal advantages", (citations omitted) nor does it require the State to "equalize economic conditions." 417 U.S. at 612, 94 S.Ct. at 2444.

In *Collins v. State,* 506 S.W.2d 179 (Tenn. Cr.App.1973), the defendant, prior to preliminary hearing, was committed to Central State Psychiatric Hospital for observation and a report thereof was submitted to the Court. Subsequently, both at a hearing to determine competency to stand trial and at the main trial, the reporting psychiatrist testified for the defendant, although "some of his testimony was damaging". 506 S.W.2d at 187. The trial judge rejected a motion to appoint a private psychiatrist, at state expense, and the Court affirmed, holding that the defendant had no right to a "psychiatric advocate."

---

1. Petitioner's court appointed counsel is commended for vigorous and effective counsel, guidance and representation at all stages of this prosecution and the ensuing appeals.

2. The petitioner was examined by a psychologist, pursuant to action taken by the trial judge. See Section IV, *infra.*

The *Collins* court relied in part on *United States ex rel. Smith v. Baldi*, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), which held that the state was not required to appoint a psychiatrist to make a pre-trial examination of an indigent patient.

See also *Crum v. State*, 530 S.W.2d 103 (Tenn.Cr.App.1975).

Essentially this is a matter that addresses itself to the judgment and discretion of the legislature. Thus far it has not seen fit to provide such services to indigent defendants.

In this particular case the defendant called as a witness a highly qualified psychiatrist whose testimony fully supported his plea of insanity. We cannot see that he was prejudiced by the action of the trial judge, in law or in fact.

We hold that an indigent defendant does not have a right under the federal or state constitution, to the services of a private psychiatrist, at state expense.

### III.

### *Admissibility of Hospital Records*

The assignment relating to the admissibility of medical and hospital records of Baroness Erlanger Hospital presents a question of first impression in this jurisdiction.

As has been pointed out, supra, petitioner had a previous history of mental problems with treatment at various hospitals. In order to show this medical history, along with the severity and degree of his previous mental difficulties, and to form a predicate for certain hypothetical questions to the psychiatrist testifying in his behalf, he attempted to introduce the records of Baroness Erlanger Hospital, covering three periods of hospitalization. The trial judge permitted their introduction for identification only.

We briefly summarize these records.

His first hospitalization in 1971 was for gunshot injuries to the right chest.

He was next admitted on May 19, 1973 with admitting diagnosis of "paranoid state." Two days after his admission the hospital forwarded a form letter to the Mental Health Officer at Chattanooga, requesting that proceedings be initiated to commit petitioner to Moccasin Bend Psychiatric Hospital stating that he is in need of continued care and treatment and is potentially dangerous to himself and others.

The appropriate psychiatric diagnosis was listed as "paranoid schizophrenia."

Twelve days later, Dr. J. S. Cheatham, a psychiatrist at Baroness Erlanger, addressed an official letter to the then attorney general of Hamilton County, advising:

A diagnosis of *"schizophrenia, paranoid type"* has been established. In my opinion, Mr. Graham is in *need of continued psychiatric care* and treatment and is *potentially dangerous to himself and others.* (Emphasis supplied).

Pursuant to this letter an order was entered in the criminal court at Chattanooga directing that petitioner remain in the psychiatric ward at Erlanger until arrangements could be made to transfer him to Central State Hospital for further evaluation and treatment. A copy of this order was filed as a part of the medical records. The record contains nothing further in this regard, except memoranda indicating that he reached Central State Hospital and was treated there.

The records so filed next reflect that he was again admitted to Baroness Erlanger on February 15, 1974 with an admitting diagnosis of "PSYCHO, UNSTABLE & DEPRESSED" and a final diagnosis of "(1) Paranoid state" and "(2) alcohol addiction."

The record indicates that he was discharged to Moccasin Bend for further treatment. It does not reveal how long he remained there but does show that he was there on June 17, 1974, approximately four (4) months before the episode forming the basis for this criminal action.

These are the records the trial judge refused to admit and which petitioner insists are admissible under the Uniform Business

Records as Evidence Act, sections 24–712, et seq. T.C.A.

Section 24–714, T.C.A. reads as follows: *Records as evidence.*—A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

■ Prior to discussing the pertinent court decisions construing this statute, it should be pointed out that these records were offered by the Director of Medical Records at Erlanger, their custodian, who identified them and testified that they were "kept and filed in the ordinary course of the business of the hospital on each patient who is admitted there." This *prima facie* qualifies the records for admission under the statute.

In *Neas v. Snapp,* 221 Tenn. 325, 426 S.W.2d 498 (1968), a workmen's compensation action, the widow of the deceased workman, as a part of her testimony, introduced an autopsy report which showed the cause of death. This Court, in holding the report to be inadmissible under the Business Records Act, was prompted by the facts that (1) the widow was not the custodian; (2) nor an "other qualified witness"; and (3) there was "no evidence from which the trial judge could determine whether, 'the sources of information, method and time of preparation' justified the admission of the report." 221 Tenn. at 330, 426 S.W.2d at 501.

Further the Court said:

Accordingly, a proper foundation for the introduction of the autopsy report does not appear in the record.

Every report or other writing is not admissible simply because it was made or rendered in the conduct of some business or profession. A compliance with all the qualifications of the statute is a prerequi-

site to admissibility. (Citing cases). *Ibid.*

■ This latter paragraph has caused some apparent confusion. What the Court was saying was that the mere fact that a report or writing was made during the conduct of some business or profession did not *per se* make it admissible, but such fact, coupled with compliance with the statutory requirements, did.

In *Covey v. State,* 504 S.W.2d 387 (Tenn. Cr.App.1973), the State called Nona Owensby, a "licensed staff psychologist" to testify to the defendant's sanity. She also testified that it was the opinion of the hospital staff that the defendant was sane. The State insisted that such testimony was competent under the Business Records Act.

The Court of Criminal Appeals, relying upon and quoting at length from *Neas v. Snapp, supra,* held that "it was error for the Court to permit Mrs. Owensby to testify as to what other alleged experts had said, and it was error to admit the report of such experts *without establishing their qualifications.*" (Emphasis supplied). 504 S.W.2d at 392.

■ With utmost deference to our colleagues of the Court of Criminal Appeals, this holding is a misapplication of *Neas.* The testimony as to what other staff members thought, absent an admission of the hospital records in accordance with the statutory criteria, was rank hearsay and so inadmissible—but not because of the Business Records Act, but because the State did not proceed under it. The witness merely attempted to testify to conclusions reached by her colleagues.

The introduction of the element of "qualification" into the Business Records Act has no sanction in *Neas.* There the first reason for declining to validate the introduction of the autopsy report was totally unrelated to the Business Records Act. It was that the admission of the report by the widow, *vis a vis* the custodian, gave "the benefit of an opinion of Dr. Moss whose *qualifications* are not shown and deprived defendant of the right of cross examination." 221 Tenn. at 329, 426 S.W.2d at 500. This phraseology

preceded the Court's discussion of admissibility as a business record.

◼ The admission of records and reports under the Business Records Act is subject to the same objection, from a practical standpoint; however, the mandate of the statute is clear. The records are admissible, as a general rule, when introduced in the proper manner and with the proper foundation. The *qualifications* of the individual preparing the record may be inquired into, may be challenged, or may be disputed but this goes to weight and not admissibility.

The Tennessee statute came under the scrutiny of the United States Court of Appeals for the Sixth Circuit in *Phillips v. Neil,* 452 F.2d 337 (1971), cert. denied, 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972). In a most excellent and elaborate opinion, the late Judge William E. Miller, of Tennessee, held that for the State, in a criminal prosecution, to read from medical records of Eastern State Hospital, violated the Sixth Amendment right of confrontation. Judge Miller, made the following apt observation:

> It is likely that Tennessee courts would find that hospital records fall within the *general application* of the statute. The great weight of judicial and scholarly authority supports such a holding. Nevertheless, that proffered evidence is a business or hospital record does not alone dispose of the question of admissibility in a specific case. (Emphasis supplied). 452 F.2d at 343–44.

◼ The Business Records Act is itself an exception to the hearsay evidence rule. It is designed to avoid the unnecessary expense, inconvenience and sometimes impossibility,[3] of calling witnesses, particulary in—but not limited to—those instances wherein the matter sought to be established is routine or uncontroverted. In the case of hospital records, without the act, it could conceivably take numerous witnesses—doctors, technicians, nurses and attendants who joined forces to make a complete and composite history of a patient's hospital treatment.

◼ Thus it is that the admissibility of records made during the course of business is the *general rule* and their *introduction is* not subject to a blanket objection on the basis of hearsay. This does not mean, however, that other recognized rules of evidence may not preclude their introduction in whole, or in part.

◼ We would not attempt to catalogue all the possibilities, but most assuredly hospital records introduced under the Act must not deprive a criminal defendant of any constitutionally guaranteed right; must be connected or related to the observation, diagnosis and treatment of the patient; must be material and relevant; must not be self-serving; and must meet all the statutory criteria. As with all other evidence, the trial judge, acting in his sound discretion, may excise from the proffered records any portions which are objectionable.

◼ We hold that the trial court committed prejudicial and reversible error in declining to admit the Erlanger Hospital records for general evidentiary purposes.

## IV.

### Tests of Criminal Responsibility

The issue of the defendant's criminal responsibility is fairly raised by the pleadings and proof. We discuss the various tests.

### A. *M'Naghten Rules*

*M'Naghten's Case,* 1 C. & K. 130, 10 CL. & F. 200, 8 Eng.Rep. 718, was decided by the House of Lords in 1843.

Daniel M'Naghten had murdered Edward Drummond, the secretary to Sir Robert Peel, the then Prime Minister of England. In the ensuing trial the jury found him to be "not guilty by reason of insanity." History records that the Queen and her subjects, were incensed and a great hue and cry resounded throughout the realm. The matter was debated in the House of Lords and it was determined that they should

---

**3.** In the instant case the two physicians who primarily made the hospital records had relocated themselves outside the state and were not available.

"take the opinion of the Judges on the law governing such cases." Five questions were put to the fifteen judges of England and the rules that emerged, since known as the *M'Naghten* rules, were as follows:

> [T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as *not to know the nature and quality of the act* he was doing; or, if he did know it, that he did not know he was doing what was wrong. (Emphasis supplied). 8 Eng.Rep. at 722.

It will be noted that we refer to the *M'Naghten* rules. We do this because scholarly texts and the more precise judicial opinions use this terminology, and correctly so because there are *two* rules. The failure of the courts of some jurisdictions, including Tennessee,[4] to recognize this has caused the rules to become to be called the *M'Naghten* rule, with a resulting confusing and narrowing of the original rules.

■ There are two *M'Naghten* tests: (1) knowledge of the nature and quality of the act and (2) knowledge of its wrongfulness. These criteria are expressed in the conjunctive in that it must be shown that the defendant knew right from wrong *and* knew the nature and quality of the act, in order to convict of a crime while laboring under a defect of reason or disease of the mind. If a defendant does not know the nature and quality of the act he is insane; if he knows this but does not know right from wrong, he is insane.

The failure to recognize and apply both prongs of this two-prong test operates to narrow the rules.

In Guttmacher & Weihofen, Psychiatry and the Law, Norton & Co. (1952) at page 404, the effect of applying only the right and wrong dichotomy, is expressed thusly:

A defendant may remember many details of his act. The prosecutor may emphasize this fact, may bring out all the little details that the defendant can recall, and may argue from this that the accused has been shown to know what he was doing. But memory of details is not knowledge of the *nature and quality of the act. That calls for something deeper and more vital.* (Emphasis supplied).

Brakel and Rock, in an American Bar Foundation Study, captioned, The Mentally Disabled and the Law, Revised Edition (2nd) 1971, at pages 379–80, pose the problem thusly:

Despite the inclusion of alternative tests in the original *M'Naghten* case, the most common form in which the *M'Naghten* test now appears is *"whether the defendant had the capacity to know right from wrong* in respect to the particular act charged." Most jurisdictions which apply *M'Naghten* seem to assume that the requirement of "knowing the nature and quality of the act" adds nothing to the right-wrong test. A cogent argument might be made that a person may be able to retain intellectual knowledge of right and wrong and yet not understand the *"nature and quality"* of his act. (i.e., its social significance). (Emphasis supplied).

It is of interest to note that Tennessee has adhered consistently to so much of *M'Naghten* as relates to "right and wrong." No reported decision of this Court, in any criminal case, has discussed the "nature and quality" portion of the rules.

In their 1971 study Brakel & Rock, at page 380, state that "[t]oday *M'Naghten* is the sole test of criminal responsibility in fewer than half of the states. Reference to 21 Am.Jur.2d, Criminal Law, Sec. 33 and an annotation appearing in 45 A.L.R.2d at 1447, will indicate that *possibly* as many as twenty-seven (27)[5] American jurisdictions basically apply *M'Naghten.*

---

**4.** *See* subsection E of this section, *infra.*

**5.** Arizona, Arkansas, California, Delaware, Florida, Georgia, Hawaii, Iowa, Kansas, Louisiana, Minnesota, Mississippi, Nebraska, Neva-

da, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Washington and Wyoming.

Numerous criticisms of *M'Naghten* have surfaced in recent years. After pointing out that "[t]he most cogent criticism of the rules is that they fail to aid in the identification of many persons accused of crime who suffer from serious mental disorders," the Tennessee Law Revision Commission, in its Proposed Final Draft, Tennessee Code of Criminal Procedure, 1973, on page 38 lists other "valid criticisms":

(1) the concept of "right and wrong" is essentially an ethical or moral concept which forces the witnesses and decision-maker to make moral, rather than medical, social, and legal judgments;

(2) The rules evolved at a time when "faculty psychology" held sway, and today the mind is known not to be neatly compartmentalized; and

(3) the rules may well have been intended to apply only to one type of illness, that characterized by delusions.

We think that unquestionably the rules tend to enforce outmoded and erroneous psychological theories, tend to limit or distort psychiatric testimony, focus on the ability to distinguish between right and wrong, ignoring the individual's ability to exercise self-control; focus on cognition and ignore the volitional aspects of personality; and punish persons for conduct beyond their capacity of control.

In a word, its application is an impediment to the fair trial that is a part of the birthright of every American citizen.

We hold with Justice Cardozo:

If insanity is not to be a defense, let us say so frankly and even brutally, but let us not mock ourselves with a definition that palters with reality. Such a method is neither good morals nor good science nor good law.[6]

### B. The Irresistible Impulse Test

Under this test a criminal defendant is said to be relieved of criminal responsibility when his mental condition is such as to deprive him of his willpower to resist the impulse to commit the crime, despite his knowledge of whether the act is right or wrong. This test does not stand alone as a test for insanity in any jurisdiction, and we reject it, believing that it is not sufficiently comprehensive.

### C. The Product Rule (Durham)

Under this rule a defendant is excused from criminal responsibility when his act was "the product of mental disease or mental defect." This test was announced in *Durham v. United States*, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); however, it was subsequently obliterated by the same Circuit in *United States v. Brawner*, 153 U.S. App.D.C. 1, 471 F.2d 969 (1972). We do not feel that this test is sufficiently complete or comprehensive to justify its adoption.

### D. Model Penal Code

The American Law Institute in its Model Penal Code, Proposed Official Draft, Section 4.01(1) proposes the following standard:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Reference to Section 39–601 of the Proposed Final Draft of the Tennessee Criminal Code and Code of Criminal Procedure will reveal substantially the same provision.[7] The Comment to the Model Penal Code accepts the theory of the combined *M'Naghten* and irresistible impulse tests

---

**6.** "What Medicine Can Do for Law," from Law and Literature and Other Essays and Addresses by Benjamin N. Cardozo, Harcourt, Brace, 1931 at p. 198.

**7.** Model Penal Code, Section 4.01, Comments, at 156–59.

that take "account of the impairment of volitional capacity no less than impairment of cognition," but it rejects both of these tests as being too narrow.

It is obvious that the phrase "to appreciate the criminality of his conduct" in the Model Penal Code is a substitute for the *M'Naghten* clause "to know the nature and quality of the act he was doing."

While we recognize that this test, like any other test of insanity, is not perfect and will itself produce problems, we are persuaded that it is the best test of insanity in existence today, combining as it does, the essential elements of cognition, volition and capacity to control behavior. In actuality it is essentially a refinement and restatement of the full *M'Naghten* rules.

### E. *The M'Naghten Rule in Tennessee*

Tennessee case law, pertinent to the issue of criminal responsibility, began with *Dove v. State*, 50 Tenn. 348 (1871) and evolved in consistent fashion, with emphasis being placed upon the "right from wrong" aspects of the *M'Naghten* Rules.

The often cited case of *Spurlock v. State*, 212 Tenn. 132, 368 S.W.2d 299 (1963) marks the last time this rule came under careful scrutiny in this Court. The Court correctly noted that the *M'Naghten* Rule "is followed by every State except one (*State v. Pike*, 49 N.H. 399), and every Federal Circuit except two (Durham and Currens [*United States v. Currens*, 290 F.2d 751, 3rd Cir.]) . . ." 212 Tenn. at 140, 368 S.W.2d at 303.

In the intervening thirteen (13) years the rule of *M'Naghten* has been substantially eroded. As heretofore pointed out, as a maximum, it is followed only by twenty-seven (27) state jurisdictions. Further reference to the same A.L.R. and American Jurisprudence citations as those contained in subsection A of this Section of this opinion, will reveal that the ALI Penal Code test has been adopted in at least seventeen (17) state jurisdictions [8] and in all the federal circuits except the First.

### F. *Federal Cases*

We look briefly at the federal jurisdictions.

Since *Spurlock, supra,* the District of Columbia departed from the *Durham* Rule and adopted a variation of the tests proposed by the American Law Institute in its Model Penal Code. *United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972). See also *Bethea v. U. S.*, 365 A.2d 64 (D.C.App. 1976). The rule announced in *United States v. Currens*, 290 F.2d 751 (1961) a modified version of the Model Penal Code continues in effect in the Third Circuit.

Six months after *Spurlock* the 10th Circuit handed down its decision in *Wion v. United States*, 325 F.2d 420 (10th Cir. 1963). Judge Murrah, writing for the Court in adopting Section 4.01(1) of the ALI Model Penal Code, stated:

We think this simple test of criminal responsibility allows the behavioral scientists "full freedom to put their professional findings and conclusions before the court and jury * * *." (Citations omitted). "[e]ven under the right—wrong test, no evidence should be excluded which reasonably tends to show the mental condition of the defendant at the time of the offense". (Citation omitted). This should go far toward bridging the gulf between psychiatry and the law, if indeed, there is one, and it will also give the trial judge a definition which he can articulate to the lay jury. 325 F.2d at 430.

In 1966 the Second Circuit joined the parade of jurisdictions moving toward the ALI Model Penal Code. In *United States v. Freeman*, 357 F.2d 606 (2nd Cir. 1966), Judge Kaufman set the moral tone and the underlying philosophy of the opinion as follows:

The criminal law it has been said, is an expression of the moral sense of the community. The fact that the law has, for

**8.** Alaska, Connecticut, Idaho, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Missouri, Montana, Ohio, Texas, Vermont, West Virginia, Wisconsin and District of Columbia.

centuries, regarded certain wrong-doers as improper subjects for punishment is a testament to the extent to which that moral sense has developed. Thus, society has recognized over the years that none of the three asserted purposes of the criminal law—rehabilitation, deterrence and retribution—is satisfied when the truly irresponsible, those who lack substantial capacity to control their actions, are punished. 357 F.2d at 615.

The court, after a scholarly and elaborate discussion of the *M'Naghten* Rules, the history of their adoption, the numerous vices inherent in them, and after discussing other rules, traced the history of the formulation of the ALI Model Penal Code and concluded that Section 4.01 was "the soundest [test] yet formulated" and adopted it as the standard of criminal responsibility in the Second Circuit. 357 F.2d at 622.

In 1972, the Eighth Circuit, in *United States v. Frazier*, 458 F.2d 911, 915 (8th Cir. 1972), adopted the full ALI Model Penal Code rule holding:

> [W]e simply find that the substance of the ALI rule invites a broader medical-legal investigation, provides improved means for communication by medical specialists, offers a better basis for understanding of complex issues by triers of fact and overall serves the desired end in the administration of our criminal laws. 458 F.2d at 917.

The Seventh Circuit, in 1967, in *United States v. Shapiro*, 383 F.2d 680, 685 (7th Cir. 1967) (en banc), adopting the full ALI rule, but substituting the word "wrongfulness" in the place of "criminality" so that the rule requires an appreciation of the wrongfulness of conduct as opposed to its criminality.[9]

The following year (1968), the Fourth Circuit in *United States v. Chandler*, 393 F.2d 920 (4th Cir. 1968), in an opinion by Chief Judge Haynsworth, rejected the *M'Naghten* test and adopted the full Model Penal Code Rule, observing that:

The American Law Institute's formulation has achieved wide acceptance . . . It substantially meets all of the criticism of the old rules and remedies their presently apparent deficiencies. It avoids the misunderstandings inherent in an undiscriminating use of the *Durham* prescription. For the present, for indiscriminate application, it is, in our opinion, the preferred formulation. With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility. Its verbiage is understandable by psychiatrists; it imposes no limitation upon their testimony, and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply. 393 F.2d at 926.

The Fifth Circuit in *Blake v. United States*, 407 F.2d 908 (5th Cir. 1969), in a most excellent opinion by Judge Griffin Bell, recognizing the number of federal jurisdictions that had adopted the Model Penal Code, and stressing the value of uniformity, adopted the full Code, or both paragraphs of Section 4.01. (See *supra*, and Sec. V, *infra*.)

The opinion of the Sixth Circuit in *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968) has come under our particular scrutiny. There the Court, in a most excellent opinion by Judge Edwards, made the following apt observation:

> The primary distinction between the Currens test as formulated by Judge Biggs and the ALI formulation is that the ALI retains specific reference to the M'Naghten test of knowledge of the wrongfulness of the act committed. Of course, the problem with M'Naghten as a test of insanity was that it defined a very limited class of the insane. M'Naghten was certainly deficient as an exclusive test. But the ALI test eliminates the exclusive character of M'Naghten while retaining its substance as one of the tests of crimi-

---

**9.** See Sec. V, *infra*.

nal responsibility. We do not regard this difference as a critical one. 404 F.2d at 726.

 The Court adopted the first paragraph of the Model Penal Code classifying it as "a test which a jury will readily comprehend; one which comports with and makes available modern scientific knowledge and one which may serve to aid the continuing development of the federal law", 404 F.2d at 727, and outlined questions for jury consideration relating to the criminal responsibility of a defendant pleading insanity as follows:

(1) Was he suffering from a mental illness at the time of the commission of the crime?

(2) Was that illness such as to prevent his knowing the wrongfulness of his act?

(3) Was the mental illness such as to render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating? *Ibid.*

Then the Court observes that "[a] negative finding as to the first question or negative findings as to both the second and third questions would require rejection of the insanity defense. An affirmative finding as to the first question, plus an affirmative finding as to either the second or third question, would require a jury verdict of 'not guilty' because of defendant's lack of criminal responsibility." *Ibid.*

We approve these questions since they succinctly state the precise issues that would be raised under the application of the Model Penal Code.

In *Spurlock, supra,* the Court followed *Andersen v. United States,* 237 F.2d 118, decided by the Ninth Circuit in 1956.

In *Wade v. United States,* 426 F.2d 64 (9th Cir. 1970) (en banc), adopted Section 4.01(1) of the Model Penal Code.

## V.

### *Adoption of ALI Rule*

 We adopt the American Law Institute Model Penal Code, Section 4.01 (1962), reading as follows:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

It will be noted that we have used the word "wrongfulness" in the place of "criminality" so that the rule requires an appreciation of the wrongfulness of conduct as opposed to its criminality.

Trial judges will formulate charges which will accurately reflect this standard. In this connection, we expressly approve the questions set forth in *United States v. Smith,* 404 F.2d 720, at page 727 (6th Cir. 1968). We also invite attention to suggested charges in *United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969, at page 1008 (1972), and in *Wion v. United States,* 325 F.2d 420, at 430 (10th Cir. 1963). While we do not approve these referenced charges in their verbatim form, we do commend them as sources for the consideration of trial judges, along with existing Tennessee law. The so-called *M'Naghten* Rules will not be charged.

We adopt the Model Penal Code primarily because it is simpler to adopt a new rule in harmony with the all but universal federal rule and with the rule being adopted by a significant number of state jurisdictions, and emerge with a better based standard of criminal responsibility. We recognize that there is not a vast difference between the rule we adopt and the *M'Naghten* Rules as they should be applied. The new rule, however, does spell out the specifics of volition and the individual capacity to control his conduct. These elements inhered in the *M'Naghten* Rules, but it is evident that they were not applied. In the last analysis the determination of insanity is for the jury and when it has had the advantage of com-

petent testimony—medical and lay—we are persuaded that under any rule, correct conclusions will be reached. We feel that the formulation of the Model Penal Code will be easier for juries to understand and will provide a simpler basis for jury instruction.

We feel that it is appropriate that we call attention to a deficiency in Tennessee law relating to the disposition of a criminal defendant found not guilty by reason of insanity. Sec. 33–709, T.C.A. provides that under these circumstances "the district attorney-general *may* seek hospitalization . . . if he determines hospitalization to be justified." (Emphasis supplied).

We feel compelled to recommend to the Legislature that this particular provision of the law be changed so as to clothe the trial judge with the authority to cause the defendant to be committed to the custody of the Commissioner of Mental Health to be placed in an appropriate institution for custody, care and treatment. See Sec. 40–2321, Proposed Penal Code, Tennessee Law *Revision Commission.* We do not think the disposition of such a defendant should be left to the discretion of the district attorney-general.

■ The Model Penal Code standards will be applied (1) in all criminal trials or re-trials beginning on or after the date of the release of this opinion and (2) in all cases wherein appropriate special requests were submitted during the trial of the action, or the issue otherwise was fairly raised in the trial court and supported by competent and credible testimony, and the conviction has not become final. Under no set of circumstances will the rule be applied to the advantage of any defendant whose conviction has already become final, i. e., where appellate review through the courts of this state has been completed.

## VI.

### Standard of Proof

The remaining assignment of error addresses itself to the burden of proof in those cases where the defendant enters a plea of "not guilty" by reason of insanity.

■ The rules are well-established in this jurisdiction. If the evidence adduced either by the defendant or the State raises a reasonable doubt as to the defendant's sanity, the burden of proof on that issue shifts to the State. The State must then establish the defendant's sanity to the satisfaction of the jury and beyond a reasonable doubt. *Collins v. State,* 506 S.W.2d 179 (Tenn.Cr.App.1973); *Covey v. State,* 504 S.W.2d 387 (Tenn.Cr.App.1973). The jury should be instructed to that effect.

■ In the instant case the jury instruction was not as specific on this point as it should have been; however, the trial judge repeatedly charged the jury that it was the duty of the State to establish its case beyond a reasonable doubt. When consideration is given to the charge in its entirety, we are unable to say that it was prejudicially erroneous.

The judgments of the Court of Criminal Appeals and the Trial Court are reversed on the basis of the error in excluding medical records under the Uniform Business Records as Evidence Act, and this cause is remanded for re-trial under the standards delineated in this opinion. We expressly do not reverse this particular case on the basis of the use of the *M'Naghten* Rules since the trial judge and the Court of Criminal Appeals correctly applied Tennessee Law. In this case, we have adopted a new standard of criminal responsibility considered by us to be more in keeping with the demand of contemporary American jurisprudence and more consonant with considerations of justice.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.

## OPINION ON PETITION TO REHEAR

HENRY, Justice.

The petition of the State of Tennessee for a rehearing is respectfully denied. Nothing in this opinion is subject to the construction that all cases wherein an insanity defense was interposed will *ipso facto* be subject to retrial.