**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**FEBRUARY SESSION, 1997**

FILED

October 7, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9509-CC-00286** |
| | ) | |
| Appellee, | ) | |
| | ) | **ANDERSON COUNTY** |
| | ) | |
| **V.** | ) | **HON. JAMES B. SCOTT, JR.,** |
| | ) | **JUDGE** |
| **JOHN PARNELL YAUGHER,** | ) | |
| | ) | |
| Appellant. | ) | **(RAPE OF A CHILD)** |

FOR THE APPELLANT:                    FOR THE APPELLEE:

**J. THOMAS MARSHALL, JR.**          **JOHN KNOX WALKUP**
District Public Defender                Attorney General & Reporter

**NANCY CAROL MEYER**                **EUGENE J. HONEA**
Assistant Public Defender             Assistant Attorney General
101 South Main Street, Suite 450     425 Fifth Avenue North
Clinton, TN  37716                      2nd Floor, Cordull Hull Building
                                        Nashville, TN  37243

                                        **JAMES N. RAMSEY**
                                        District Attorney General

                                        **JANICE G. HICKS**
                                        Assistant District Attorney General
                                        127 Anderson County Courthouse
                                        Clinton, TN  37716

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, John Parnell Yaugher, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The Defendant was convicted following a jury trial in Anderson County of the offense of rape of a child. On appeal, the Defendant challenges the sufficiency of the allegations in the indictment to charge an offense. Also, the Defendant challenges the sufficiency of the evidence to sustain the conviction and specifically argues that his confession was uncorroborated, that there was no proof of penetration, and that the State failed to prove beyond a reasonable doubt that he was sane at the time of the offense. Further, the Defendant argues that the trial court erred in denying a motion to suppress his statement to investigators and by charging in the jury instructions the lesser grade offense of aggravated sexual battery. Finding no error, and that the indictment and the evidence are sufficient, we affirm the judgment of the trial court.

## I. SUFFICIENCY OF THE INDICTMENT

The Defendant contends that the indictment fails to state an offense in that no culpable mental state is alleged. He relies upon State v. Roger Dale Hill, Sr., No. 01C01-9508-CC-00267, Wayne County (Tenn. Crim. App. June 20, 1996), app. granted (Tenn. Jan. 6, 1997), in which this court held that an allegation that the Defendant unlawfully sexually penetrated a victim did not allege the necessary mental state for rape, which is, at least, recklessness. We note that other panels of this court have concluded that such allegations are sufficient.

See, e.g., State v. James Dison, No. 03C01-9602-CC-00051, Sevier County (Tenn. Crim. App. Jan. 31, 1997), applic. filed (Tenn. Mar. 14, 1997); State v. Phillip Ray Griffis and Melissa Faith Rogers, No. 01C01-9506-CC-00201, Maury County (Tenn. Crim. App. Apr. 30, 1997, applic. filed (Tenn. June 19, 1997).

However, we believe that the indictment in this case is sufficient regardless of which view is taken. The indictment charges, in pertinent part, that the Defendant "did . . . unlawfully and feloniously engage in sexual penetration of a child less than thirteen years of age, in violation of T.C.A. § 39-13-522, against the peace and dignity of the State of Tennessee." (Emphasis added). Historically, the word "feloniously" has meant "[p]roceeding from an evil heart or purpose; done with a deliberate intention of committing a crime." Black's Law Dictionary 6th ed. 1990). As our supreme court has previously noted, "one meaning attached to the word is: 'In a legal sense, done with the intent to commit a crime.'" State v. Smith, 119 Tenn. 521, 105 S.W. 68, 70 (1907). Certainly, the mental state necessarily inherent in the word "feloniously," would include the mental state required by present law. There is no merit to this issue.

## II. SUFFICIENCY OF THE EVIDENCE

The standard for when an accused challenges the sufficiency of the convicting evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage,

571 S.W.2d 832, 835 (Tenn. 1978).  Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court.  State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987).  Nor may this court reweigh or reevaluate the evidence.  Cabbage, 571 S.W.2d at 835.  A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State.  Grace, 493 S.W.2d at 476.

The State's proof was that the victim, T.T. (we will refer to the victim of child sexual abuse by initials), and her mother and father, David and Darla Taylor, and the victim's two (2) siblings had resided in their home in Oak Ridge since March 1987.  The Defendant, his wife and daughter lived across the street and had resided there since July of 1992.  The victim, seven (7) years old at the time of the offense, and the Defendant's daughter, nine (9) years old, were close friends and often spent the night at each other's homes.

On an occasion in March 1993, after being asked to spend the night with the Defendant's daughter, T.T. refused and almost began crying.  Her mother became suspicious and asked her daughter if she wanted to tell her something.  The victim was visibly upset and obviously did not want to talk in the presence of

-4-

her brother and sister.  Ms. Taylor took the victim to the bedroom where she began to cry and was displaying signs of embarrassment.  Concerned by her daughter's behavior, Ms. Taylor retrieved a coloring book which concerned good and bad secrets and included advice to keep "good" secrets to oneself and not keep "bad" secrets.  After reviewing the coloring book, T.T. told her mother that the Defendant had touched her.  Ms. Taylor called the Tennessee Department of Human Services two (2) days later and subsequently confronted the Defendant and his wife with the victim's allegations.

The State's proof, through the testimony of the victim, further showed that T.T. went to sleep on the living room floor on the last occasion that she spent the night with the Defendant's daughter.  The room was dark and T.T. did not know if Defendant went to sleep on the floor with them.  T.T. was sleeping in her mother's t-shirt and panties.  During the night she awoke and the Defendant was touching her with his hands and fingers, first on her stomach and down to her bladder, then inside her panties and on her back side.  At the time, T.T. did not say anything but could hear the Defendant breathing heavily.  She testified that the Defendant rubbed her "china," which was her term for the vagina, but that it did not hurt her.  At trial, T.T. stated that the Defendant's finger did not go inside her.  She was not aware if the Defendant put any cream on her while he was rubbing her.  She testified that she informed her mother of the incident a few days later and then talked with two (2) police officers about the occurrence.

Dr. Tanya Vargas, a physician, examined T.T. and testified that the victim was worried that she might have gotten a disease from the Defendant.  T.T. responded affirmatively to Dr. Vargas' questions as to whether anyone had

-5-

touched her in an inappropriate place. The victim stated to Dr. Vargas in the examination that the Defendant stuck his fingers in her "china" when she was staying at his daughter's house overnight. Dr. Vargas asked her what "china" meant and showed her a picture of the female body. The victim pointed to the vagina. Dr. Vargas testified that she noted from the examination that the child's vaginal mucosa was very red, but there was no discharge. T.T. was suffering from scratches which were secondary to scabies. All other physical exams were normal.

George Staffney, a detective with the Oak Ridge Police Department, and Gaynor Byrge, an employee of the Tennessee Department of Human Services, investigated the victim's allegations against Defendant. On March 11, 1993, they contacted the Defendant at his home and made an appointment for him to come to an interview on March 12 at the Oak Ridge Police Department. When the Defendant arrived on March 12, Detective Staffney told the Defendant that if he did not want to answer the questions, or if he wanted to leave, that he was free to go as he was not under arrest. Byrge and Staffney did not perceive Defendant having any difficulty understanding and comprehending what was going on, even though the Defendant told them he had previously suffered a stroke and it affected his memory slightly. When informed of the allegations, Defendant told the investigators that T.T.'s face was against his back while they were sleeping and she snuggled up against him. He turned and began to rub her stomach. He stated that he "had to put some medicine on her and when he put cream on her vagina his finger slipped in." Defendant told them "[i]t was for medical purposes, not sexual." Defendant stated that he was afraid he would get in trouble and asked if he could get counseling or some other kind of help. He also made the

statement that "a good time to teach about sex was [at] eight (8) years old." After these verbal statements were made, the investigators read a waiver of rights form to Defendant. When the investigators asked Defendant if he wanted to make a written statement, he replied affirmatively. Detective Staffney told Defendant to be descriptive about what he actually did to the child and to include the portion regarding what happened with him penetrating the victim with his finger. Defendant also drew a diagram of the scene in his home at the time of the incident on the written statement. The investigators stated that they never made any threats or promises to Defendant and he never gave any indication that he did not want to talk to them.

The statement written by Defendant in his handwriting and signed by him states as follows:

> I had Sexual Contact Rubbing & with Finger in the Private Area [T.T.] on March 2nd - 1993 - My Home 112-Wain Wright, Oak Ridge.
>
> Sarah my Daughter - [T.T.] & I myself was Sleeping on the Living Room Floor.
>
> [T.T.] move over to my Side & I touch her Tummy & her Leg - I Put My Finger Inside Her Private Area - Vagina. She move herself away.

The Defendant testified and offered the testimony of various witnesses. His wife testified that T.T.'s mother confronted her regarding the allegations of abuse by stating that "John [Defendant] touched her butt." She related that the Defendant appeared to be shocked when first confronted about the allegations and stated that all he had done was put some cream on her tummy and lower back for itching. T.T.'s mother admitted she had made a mistake when talking to Defendant's wife. However, investigators came to the house a few days later.

Ms. Yaugher went with her husband to his interview at the police department on March 12th, and she had never observed him being that upset or emotional before. He was crying uncontrollably and wringing his hands after the interview, stating that he could not believe all of this was happening. Frightened about what she observed, the Defendant's wife took him to see Dr. Ann Carter, who made arrangements for him to be admitted to Methodist Hospital in Oak Ridge.

Regarding the Defendant's mental state, Ms. Yaugher also testified about Defendant's behavior prior to the interview at the police department and his hospitalization. One month prior to the allegations being made known, Ms. Yaugher noticed her husband's behavior was out of the ordinary. He was forgetful at times. As an example, she stated that Defendant bought her a card for Valentine's Day without purchasing the envelope. Michael Walker, the Defendant's brother-in-law, also testified as to the Defendant's mental state at the time of the offense. In January 1993, he visited with Mr. and Ms. Yaugher. Mr. Walker observed that while the Defendant was normally very precise in his deeds and actions, that during this particular visit Defendant was not able to apply the directions concerning a job he was performing while doing renovation work at his home. On another occasion, Walker testified that the Defendant called him and was lost and could not find his way to a neighborhood car dealership located one and one-half (1½) miles from his home. Additionally, Walker stated that on the occasion Defendant went to the store to get a Valentine gift for his wife, he arrived at the cash register with an Easter basket. Walker acknowledged that the Defendant had discussed his concerns regarding his behavior with Mr. Walker. Upon discharge from the hospital, Walker observed that the Defendant was a

completely different person who was able to communicate and properly show his feelings.

Dr. Michael Fisher testified regarding the Defendant's psychiatric treatment. He met Defendant on March 12, 1993 after a referral due to the Defendant's depression and suicidal tendencies. He determined that Defendant was suffering from major depression and pre-senile dementia, which is the occurrence of dementia in a person who has not yet reached the age of sixty-five (65) years. Dr. Fisher testified that these conditions would have significantly impaired the Defendant's ability to reason and his capacity to conform his conduct to the requirements of the law on the date of the alleged sexual abuse. In his expert opinion, Defendant had been suffering from dementia for at least three (3) months prior to the exam on March 12. Dependent upon the circumstances, Defendant's mental condition could affect his capacity to resist the will of another person.

Regarding Defendant's interview with the investigators, Dr. Fisher opined that Defendant could not have thought clearly enough to know or understand his legal rights. During cross-examination, Dr. Fisher admitted that the Defendant's medical tests, including an EEG and CT scan, appeared normal and did not show any damage to the brain. He also admitted that the Defendant in a general way understood that it is wrong to use a seven (7) year old child as a sexual object.

In summary, Dr. Fisher testified that Defendant, on the date of the offense, was mentally impaired due to his dementia and depression, was unable to conform his conduct to the requirement of law, and had a "substantial impairment of his capacity to appreciate the lawfulness of the alleged offense." He admitted

that the Defendant understood that the offense alleged in the case was wrongful conduct, but explained that the Defendant had a problem with his judgment, which included "impulse control." It was Dr. Fisher's opinion that "if in fact the Defendant committed the offense, it was an impulsive act." On redirect examination, Dr. Fisher stated that the CT scan and EEG test were done to "rule out any treatable causes for dementia," and indicated the results were not inconsistent with diagnosis of dementia.

The Defendant's testimony at trial was that the victim woke him up on the night of the incident, and she was scratching herself. He noticed the scratches were bleeding and remembered that there was some cream ointment in the house. He applied it to the victim's stomach. He testified he believed that if he attempted to leave the police interview, he would be placed in jail. He claimed that Detective Staffney got tough with him, yelling that he (Staffney) was tired of this "B.S." and that the Defendant was going to prison. He claimed to have become scared at this point and went into "shock" when Detective Staffney informed him that they would take Defendant's daughter away from him. He claimed that the investigators told him what to draw on the statement and forced him to write that he had placed his finger inside the victim's vagina.

In rebuttal, Dr. Margaret Delmonico, a forensic psychologist, testified that she evaluated the Defendant to determine whether he was competent to stand trial and to determine his mental condition at the time of the offense. She stated her conclusions were that Defendant was competent to stand trial and was both able to understand the wrongfulness of his conduct and to conform his conduct to the requirements of the law at the time of the alleged incident.

A. CORROBORATION OF CONFESSION

Defendant argues that the evidence was insufficient to convict him because his confession was uncorroborated by independent proof. Defendant was convicted of the offense of rape of a child, which is the unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age. Tenn. Code Ann. § 39-13-522. Only slight evidence of the corpus delicti is necessary to corroborate a confession in order to sustain the conviction. State v. Ervin, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986).

In Ervin, the defendant was convicted of aggravated rape and aggravated sexual battery. The eleven (11) year old victim in that case told several people prior to trial that the defendant had fondled her private parts and inserted his fingers into her vagina on various occasions. A pelvic examination of the victim indicated an enlarged vaginal opening which could be caused by digital penetration. The defendant gave a tape recorded confession admitting that he had placed his fingers inside the victim's vagina. Prior to trial, the victim recanted the allegations of sexual abuse by the defendant. At trial, she denied that appellant had sexually abused her. The defendant did not testify at his trial. Rejecting the defendant's argument that his confession was not corroborated, and therefore the evidence was sufficient to sustain the conviction, our court held:

> The corroborative evidence which tends to prove the truthfulness of the defendant's statements need not be sufficient to establish the corpus delicti of the offense charged.

State v. Ervin at 72.

In the case sub judice, even though the victim denied that Defendant's fingers went inside her, she testified that his fingers went inside her panties and he rubbed her vaginal area. In addition, Dr. Vargas testified that the vaginal mucosa was red, without discharge. Under this court's holding in State v. Ervin, we find that there was sufficient evidence to corroborate Defendant's confession, and this issue has no merit.

### B. PROOF OF PENETRATION

Defendant argues that there was insufficient proof of penetration to support his conviction. Defendant signed a written statement to investigators in which he confessed to the digital penetration of the victim. We have heretofore held that there was sufficient corroboration of this confession to sustain the conviction. This issue is without merit.

### C. DEFENSE OF INSANITY

Defendant asserts that the State did not prove his sanity at the time of the offense beyond a reasonable doubt. We note that the offense in this case occurred prior to the effective date of the amendment to the statute setting forth the insanity defense. Tenn. Code Ann. § 39-11-501 (Supp. 1996). We therefore address this issue according to the law prior to July, 1995.

The law presumes that one who is accused of any crime is sane. State v. Overbay, 874 S.W.2d 645, 650 (Tenn. Crim. App. 1993). If, however, evidence introduced during the course of a trial creates reasonable doubt on the sanity

issue, the burden of proof shifts from the defendant to the State. At that point, the State must establish the defendant's sanity beyond a reasonable doubt. Overbay, 874 S.W.2d at 650.

> As stated in State v. Overbay:
>
> The test of sanity was established in [Graham v. State, 547 S.W.2d 531 (Tenn. 1977)]; the *State* must show by sufficient proof "(1) that at the time of the offense the defendant was not suffering from a mental disease or defect, *or* (2) if he was, that his illness was not such as to prevent him from knowing the wrongfulness of his conduct *and* from conforming his conduct to the requirements of law."

State v. Overbay, 874 S.W.2d at 650 (emphasis in original).

In summary, the Defendant offered proof from Dr. Fisher and also lay testimony which raised the issue of Defendant's sanity. The State offered the proof of Dr. Delmonico, who testified that Defendant was able to understand the wrongfulness of his conduct at the time of the offense and that he had a substantial capacity to conform his conduct to the requirements of the law.

While Dr. Delmonico's examination was limited to a one (1) hour interview, and Dr. Fisher saw the Defendant on several occasions, we agree with the State that the basic foundation of Dr. Fisher's conclusion was based upon the fact that if Defendant did commit the act, it was "impulsive behavior." In Graham v. State, 547 S.W.2d 531 (Tenn. 1977), our supreme court specifically rejected application in Tennessee of an insanity defense based upon the "irresistible impulse test." In doing so, the supreme court held:

Under [the irresistable impulse] test, a criminal defendant is said to be relieved of criminal responsibility when his mental condition is such as to deprive him of his willpower to resist the impulse to commit the crime, despite his knowledge of whether the act is right or wrong. This test does not stand alone as a test for insanity in any jurisdiction, and we reject it, believing that it is not sufficiently comprehensive.

Graham, 547 S.W.2d at 540.

One expert witness testified that, in his opinion, the Defendant met the insanity test of Graham v. State. Another expert witness called by the State contradicted this proof. As stated above, the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This issue is without merit.

## III. ADMISSION OF CONFESSION

The Defendant argues that the trial court erred by denying his motion to suppress his statement of March 12, 1993 to Detective Staffney and Ms. Byrge of the Tennessee Department of Human Services. The motion to suppress was taken up by the trial court during two separate hearings. At the first hearing, Dr. Michael Fisher, the psychiatrist, was called to testify by the Defendant. He testified that on the date Defendant's statement was given to the authorities, March 12, 1993, that Defendant was suffering from two (2) mental illnesses, a major depressive episode and pre-senile dementia. According to Dr. Fisher, Defendant had a moderate to severe impairment due to the mental illness. Based upon his expertise, Dr. Fisher relayed that he did not think Defendant

-14-

could "exert a will of his own," and that "[Defendant] would have difficulty understanding most anything that day."

The doctor stated that in taking Defendant's history, he was informed that the Defendant had a three (3) month history prior to March 12, 1993 of suffering major depressive symptoms in addition to symptoms of dementia. In response to a question from the trial court as to whether the Defendant's voluntarily coming for treatment indicated that he knew and had the capacity to understand there was something wrong, Dr. Fisher agreed that Defendant "understood something was wrong." While Dr. Fisher concluded that the Defendant, under the circumstances of interrogation by law enforcement officers, could not fully comprehend what he was doing at the time, he admitted that everyone has the power to decide, "even the most mentally incompetent person." He admitted that it was doubtful that Defendant would "jump off of a bridge" if he had been approached by a total stranger who requested him to so do.

Dr. Fisher did not go out and investigate the circumstances surrounding the interrogation of Defendant, and did not talk to the police officer or anyone else who was present at the time of the interrogation. He also admitted that the Defendant could walk around in society, perform a job, and talk rationally to people while suffering from the pre-senile dementia and depression.

At a subsequent hearing on the motion to suppress, Detective Staffney testified that he and employees from the Department of Human Services went to the Defendant's home the day before Defendant gave the statement. They advised Defendant of a referral of possible child abuse and that they wanted to

-15-

speak to him the following day at police headquarters. Defendant agreed to come, and did show up for the meeting on March 12 at police headquarters. Defendant was free to leave at any time, and was told so by Detective Staffney. After giving a verbal statement, Defendant was read a waiver of rights form and signed it. The Defendant subsequently gave the written confession that is detailed above in this opinion. According to Detective Staffney, he did not tell the Defendant what to put in the statement other than he asked Defendant to include details involving sexual contact in the written statement. The Defendant wrote the entire statement himself.

Ms. Byrge testified that she did not notice anything unusual about the Defendant either at his home on March 11 or during the interrogation the following day at police headquarters. There was nothing to indicate Defendant was under the influence of alcohol or drugs at the time of the interrogation. The Defendant was cooperative throughout the interview on March 12, never asked for an attorney, and never gave any indication that he wanted to leave or end the interrogation prior to its conclusion by Detective Staffney and Ms. Byrge. Defendant also asked for some help for his problem. The Defendant told Ms. Byrge and Detective Staffney that he had previously suffered a stroke, which affected his memory a little bit. He never indicated at any time during the interview that he was having trouble remembering events being discussed.

In his ruling, the trial court specifically found that the law enforcement officer and the Department of Human Services worker who interviewed Defendant did nothing to coerce him into giving a confession. While the trial court specifically found that Dr. Fisher's expert opinion had not been rebutted, he

did "not find" that it necessarily reflects that [Defendant's] condition was as he [Dr. Fisher] related it.

With regard to the standard of review for a suppression issue, our supreme court recently stated in State v. Odom, 928 S.W.2d 18 (Tenn. 1996):

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Odom, 928 S.W.2d at 23.

In State v. Green, 613 S.W.2d 229 (Tenn. Crim. App. 1980), our court held:

> No Tennessee case has discussed the effect that insanity has upon the competency of a confession. The general rule is that a confession is admissible even though it was made at a time when the accused was under the influence of narcotic drugs or alcohol, if at that time the accused was capable of making a narrative of past events or of stating his own participation in the crime. [citations omitted]. We think this rule should apply equally to the issue of insanity.

Green, 613 S.W.2d at 232-33 (emphasis added).

The Defendant relies upon the case of State v. Benton, 759 S.W.2d 427 (Tenn. Crim. App. 1988) in support of his argument. While our court did hold in that case that the confession was not "voluntary" within the meaning of the due process clause of the Fourteenth Amendment, the Fifth Amendment of the United

States Constitution, and Article I, § 9 of the Constitution of the State of Tennessee, we can readily distinguish that case from the case sub judice. In Benton, the defendant was a forty-three (43) year old man whose mind functioned as a five (5) year old child. The defendant's ability to communicate was even poorer in that he was unable to read, write, or count, and could only understand very simple verbal instructions. In addition, the defendant in Benton was taken into custody, transported in a police vehicle to headquarters, and subjected to questioning in spite of his retardation and his expressed desire for his father to be present with him during interrogation.

We simply do not find a similar set of facts in the case sub judice. We agree with the trial court that the testimony of Dr. Fisher does not necessarily reflect that the Defendant's condition was such that he could not form his own will or that Defendant was subjected to coercion by the interrogators. Defendant was able to relate specific events and wrote out the confession himself. The testimony of the investigators also rebuts the conclusions made by Dr. Fisher. This issue is without merit.

## IV. JURY INSTRUCTIONS

Defendant argues that the trial court erred by instructing the jury on the lesser grade offense of aggravated sexual battery over his objection.

While this issue is titled by the Defendant in his brief as a challenge to the legal sufficiency of the evidence to sustain "a conviction for aggravated sexual battery," it clearly relates to the trial court giving the jury the instruction on the

-18-

lesser offense of aggravated sexual battery. As such, the issue was not contained in either the Defendant's original motion for new trial or subsequently filed amended motion for new trial, and is therefore waived. T.R.A.P. 3(e). We note that even if not waived, the issue would be totally without merit. Defendant was convicted of the offense of rape of a child. We fail to see how a jury instruction on the lesser offense of aggravated sexual battery, even if erroneously given, could be prejudicial to the Defendant in such circumstances. This issue is without merit.

Finding no reversible error, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, Judge


CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
JERRY L. SMITH, Judge