IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 25, 2001

## MICHAEL E. WALDRON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-A-546     Cheryl Blackburn, Judge**

---

**No. M2000-00772-CCA-R3-PC - Filed June 1, 2001**

---

The petitioner appeals the denial of his petition for post-conviction relief. Having been indicted by a Davidson County Grand Jury on three counts of rape of a child and one count of aggravated sexual battery, the petitioner pled guilty to two counts of rape of a child, a Class A felony, and the remaining counts were dismissed. In this appeal, petitioner raises three issues: (1) whether he received effective assistance of counsel; (2) whether the State and the trial court should have requested forensic psychological evaluation of the petitioner and a competency hearing; and (3) whether his plea was constitutionally valid. The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. DAVID H. WELLES, J., Not Participating.

Leslie A. Bruce, Nashville, Tennessee (on appeal) and Terry Canady, Madison, Tennessee (at trial) for the appellant, Michael E. Waldron.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner, Michael E. Waldron, appeals the denial of his petition for post-conviction relief. He was indicted by a Davidson County Grand Jury on three counts of rape of a child and one count of aggravated sexual battery, the crimes alleged to have occurred on various dates in 1996. On September 4, 1997, appointed counsel filed a motion to suppress statements made by the petitioner to a police officer. That motion was denied. Subsequently, the petitioner entered a guilty plea to two counts of rape of a child, a Class A felony, and the remaining counts were dismissed. According to the plea agreement, the petitioner received concurrent sentences of fifteen years on each count, to be served in the Department of Correction at one hundred percent.

The petitioner timely filed a *pro se* petition for post-conviction relief. Subsequently, counsel was appointed and an amended petition filed. Hearings on the petition were held on December 8, 1999, and on February 22, 2000. Both the petitioner and his trial counsel testified. The petition was denied in a detailed written ruling of the post-conviction court on March 10, 2000. In this appeal, the petitioner presents the following issues, which we consolidate for purposes of clarity:

> I.   Whether petitioner was denied effective assistance of counsel based on the following claims: (a) that counsel failed to request forensic psychological evaluation of petitioner and a competency hearing; and (b) that counsel failed to properly present the evidence and the law regarding petitioner's motion to suppress;
>
> II.  Whether both the trial court and the State had a duty to request forensic psychological evaluation of the petitioner and a competency hearing and erred in failing to fulfill this duty; and
>
> III. Whether the petitioner's guilty plea was knowing and voluntary.

## **FACTS**

The facts of this case were presented by the State at the guilty plea hearing, without objection. The single, most incriminating evidence was an interview between the petitioner and Detective Ron Carter, taped without the petitioner's knowledge on September 17, 1996. Over the course of that interview, the petitioner admitted to having had oral sex with the victim, SH,[1] an eleven-year-old girl.[2] The petitioner, who valued highly his leadership role in the Boy Scouts, asserted that SH threatened to tell about her smoking marijuana with the petitioner and, possibly, about their sexual relationship, which, according to the victim, included vaginal intercourse. The petitioner apparently feared and dreaded what these revelations would do to his position in the Boy Scouts. The incidents to which the petitioner pled guilty on March 4, 1998, took place both at his home in a basement playroom and at the victim's home. The victim apparently disclosed the relationship to a family member who had found a letter that the victim had written to the petitioner.

Detective Ron Carter, an officer since 1977 with the Youth Services Division of the Metro Police Department, arrived at the petitioner's place of work, Moeller Manufacturing Company in Brentwood, Tennessee, on the morning of September 17, 1996, and asked to speak with the petitioner. Detective Carter arrived in an unmarked car. He was wearing casual clothes and did not identify himself as a law enforcement officer. John Bradford, shop supervisor, told the petitioner that he had a visitor and needed to "go up front." Once Detective Carter and the petitioner stepped

---

[1] It is the policy of this court to use initials only when referring to a minor victim of sexual abuse.

[2] The petitioner spoke of three years of "hell" during the taped interview, implying that his relationship with SH began at an even earlier age. The petitioner also admitted to digital penetration of the victim's vagina.

outside the building, Carter identified himself to the petitioner, showing him his badge. The defendant stated on the tape that as soon as he saw the badge, he knew what it was about.

The two men walked to Detective Carter's car where the petitioner got in on the passenger side, and Carter sat in the driver's seat. The air conditioning system was running, and the two men spoke for more than an hour. The defendant left at one point to retrieve cigarettes. On his return to the car, the conversation continued. Detective Carter told the petitioner some ten times that he was not under arrest; that at the conclusion of their interview he would be free to return to his regular routine; and that nothing was going to happen to him, at least in the coming weeks. The petitioner clearly feared the eventual outcome of the case, stating that he would end up in prison. Finally, the petitioner returned to his job, although John Bradford described the petitioner in the following way: "He was physically shaking. He was broken out in a cold sweat. I became concerned for his safety, and, actually, I told him to go home." The petitioner did leave for the rest of the day.

Within days of his interview with Detective Carter, the petitioner sought treatment for anxiety and depression from Dr. Ronald Salomon and continued to meet with Dr. Salomon over the next year. Apparently, the existence of the taped confession became known to the petitioner, and he sought to suppress the tape. A hearing was held on September 4, 1997, at which time Dr. Salomon testified that the petitioner had never been treated for depression prior to Dr. Salomon's treating him by means of psychotherapy and medication. Subsequent to the denial of his motion to suppress, the petitioner pled guilty to two counts of rape of a child. It is the constitutionality of that plea and of the assistance of his trial counsel that are the subjects of this petition for post-conviction relief.

## ANALYSIS

### Issue I. Assistance of Counsel

Petitioner argues that he was denied his constitutionally protected right to counsel because he received ineffective assistance of counsel. Specifically, the petitioner alleges that his trial counsel, a practicing attorney for some eleven years with approximately half of his practice in the criminal area, was ineffective for failing to request a forensic psychological evaluation and a competency hearing and for failing to properly present evidence and the law during the hearing on his motion to suppress the taped interview with Detective Carter. We begin by noting the well-established principles that govern our review when the issue raised is ineffective assistance of counsel.

### A. Standard of Review

The findings of fact of the post-conviction court are conclusive on appeal, unless the evidence preponderates against the findings, see State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)); and the appellate court cannot "reweigh or reevaluate" the evidence. Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997), cert. denied, 525 U.S. 830, 119 S. Ct. 82, 142 L. Ed. 2d 64 (1998). However, the appellate court's review

of the application of the law to the facts is *de novo*, without a presumption of correctness. See Burns, 6 S.W.3d at 461; Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 1997). Additionally, issues as to whether counsel was ineffective and whether prejudice resulted are mixed questions of law and fact. Burns, 6 S.W.3d at 461 (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996)).

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The U.S. Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. Petitioner must, therefore, establish that "the advice given or the service rendered was not within the range of competence demanded of attorneys in criminal cases[.]" Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

As for the prejudice prong of the test, the Strickland court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (holding that petitioner failed to establish that "there is a

-4-

reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different"). In the context of a guilty plea, a petitioner must show that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

## B. Failure to Request Forensic Psychological Evaluation and Competency Hearing

First, the petitioner contends that his trial counsel should have ordered forensic psychological evaluation and a competency hearing once it was clear that petitioner's mental condition was impaired. Petitioner asserts that an evaluation and competency hearing would have shown: (1) that he was too impaired to know what he was saying to Detective Carter in the inculpatory taped interview; (2) that his mental condition and the medications he was taking under the care of Dr. Salomon impaired his ability to participate in his defense or plea negotiations; and (3) that his mental condition and the medications he was taking made his guilty plea contrary to his will.[3]

_____

[3]The type of medication taken by petitioner was described by Dr. Salomon as an "antidepressant." Dr. Salomon testified that the petitioner had also previously taken "anti-anxiety" medication. Dr. Salomon testified that he did not prescribe any type of sleep medication. Petitioner testified at his post-conviction hearing that Dr. Salomon prescribed medications during his treatment including Trazodone, Wellbutrin, Remeron, and Risperdal. At his post-conviction hearing, a photocopy of a printout from CVS Pharmacy of drugs prescribed by Dr. Salomon was entered as an exhibit. This document showed prescriptions written by Dr. Salomon, with the first being dated October 25, 1996, for Buspar and Trazodone. The document also showed prescriptions for Lorazepam, Wellbutrin, Risperdal, and Remeron, all prescribed by Dr. Salomon, with the most recent date being January 13, 1998. Petitioner was taken into custody following his guilty plea hearing on March 4, 1998. Petitioner testified at his post-conviction hearing that he was no longer taking any medications.

# 1. Taped Confession

Expert testimony concerning the mental condition of the petitioner at the time the taped interview with Detective Carter was made, and before the petitioner ever sought treatment from Dr. Salomon, came from Dr. Salomon himself at the suppression hearing, which was the only time Dr. Salomon testified in this case.[4] Dr. Salomon, an assistant professor of psychiatry at Vanderbilt University and a practicing psychiatrist, after listening to the taped interview, testified to the following:

> Yeah. It should be understood that Michael has somewhat of a very clear cut mind between right and wrong, and he feels he is either all right or all wrong, and in view of that, he was feeling that something was very wrong. The interrogation went on for some time, with several questions being asked regarding whether there was sexual relations going on between Michael and the accuser. Michael repeatedly said no, and later on in the tape was giving testimony, well, giving a statement that, you know, I don't think he had any real capacity to know what he was saying, he was under such duress.
>
> He is someone who would try and, at a certain point, get out of a situation, and say what was necessary under this kind of duress; would say things that later he wouldn't recall having said, or wouldn't recall having any reason to say.
>
> I don't think that this was a interview that gives any indication about whether he did anything or not.
>
> . . . .
>
> In a situation where he is being urged to say something, it is very, very possible for him to diverge from reality and say things that don't correlate with reality.
>
> . . . .
>
> In an interview situation like this, he was trying very hard, I think, from what I've understood in the interview to tell the truth and also to please the interviewer at the same time, and it is in that struggle that he began to have a breakdown of what he could and couldn't say, and this is where, I think, we lose credibility with the

---

[4]All attempts by post-conviction counsel to contact Dr. Salomon regarding the post-conviction hearing were unsuccessful.

interview. The situation is such then that he is saying things that really don't have a basis necessarily in reality. It is very difficult to decide, at that point, what the reality is.

On cross-examination, Dr. Salomon testified to the following:

He denied many things throughout the tape. He denied things repeatedly. He denied everything. At some points, he gave in to one thing or another, but that has very little weight, given the condition he was in during that interview.

The remaining cross-examination dealt with Dr. Salomon's opinion that the petitioner "dissociated" at certain times during the interview and that he was able to remember certain things and not others, depending on these "dissociative" states.

Petitioner must show that the specific decision of counsel not to attempt to build a defense based on mental impairment was unreasonable in that "no competent counsel would have made such a choice." Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998). Further, the reasonableness of counsel's decision not to investigate a possible defense is affected and guided by the client's own statements or actions. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066.

While it is true that the petitioner claimed an inability to remember whole sections of what was said during the taped interview with Detective Carter, he was able to remember those events or statements that tended to be favorable to him, such as his asking for permission to leave to get cigarettes as indicating that he thought he was "in custody." As Dr. Salomon admitted, testing of the petitioner could possibly have shown the petitioner to be a malingerer rather than someone suffering from "dissociative episodes."

The evidence showed that the petitioner's stress-related symptoms followed, understandably, on the heels of his interview with Detective Carter. There was no evidence of any prior mental illness. The words of the petitioner captured on tape detail, in a clear and logical fashion, a narrative of the events leading up to the interview. Petitioner expresses reasonable fear concerning the eventual outcome and seeks to explain away his relationship with SH while admitting to specific sexual acts. We conclude that counsel was not unreasonable in failing to seek forensic psychological evaluation of the petitioner or a competency hearing to show that the petitioner was suffering from a mental disorder that made his confession a fabrication.

## 2. General Competence

Petitioner also claims that his counsel was ineffective for failing to seek forensic psychological testing of petitioner and a competency hearing because these procedures would have shown that his mental condition and the medications he was taking impaired his ability to participate in his defense or plea negotiations.

The petitioner was released on bond following his arrest and was able to meet often with trial counsel. Petitioner and counsel had met approximately a dozen times. There was no testimony to indicate that the petitioner was unable to comprehend the advice of his counsel or assist in his defense. In fact, in a sworn statement, entered during the post-conviction hearing for identification purposes only, Dr. Salomon stated the following:

> His medications at that time [guilty plea submission hearing] included two potent antidepressants, Wellbutrin 150 mg daily and Remeron 30 mg at bedtime, with [T]razodone 50 mg at bedtime as needed for sleep. Wellbutrin has few side effects. Remeron and [T]razodone may cause some drowsiness. Neither is expected to have major tranquillizing effects or cause cognitive impairment.

When asked by the post-conviction court if counsel had any question concerning petitioner's competence to enter a guilty plea, trial counsel responded "Oh, absolutely not. No."

We conclude that trial counsel was not ineffective in failing to seek forensic psychological evaluation or a competency hearing to show that petitioner was not competent to stand trial or enter a guilty plea.

### 3. Guilty Plea

Petitioner also asserts that trial counsel was aware of his "significantly impaired mental state" and should have sought forensic assessment and a competency hearing before allowing petitioner to enter his guilty plea to two counts of rape of a child.

Trial counsel testified that he had met with the petitioner for several hours on the Saturday prior to the guilty plea hearing and that they had discussed the charges against the petitioner, the range of punishment, and the evidence the State had against him "over many hours." While evidence showed that trial counsel was aware of the fact that the petitioner was receiving medications for depression and anxiety and was under Dr. Salomon's care, trial counsel testified that at no point did Dr. Salomon suggest to him that petitioner was not competent to either stand trial or enter a guilty plea. Trial counsel testified at the post-conviction hearing that his trial strategy, once the tape was ruled admissible, was to attack the taped confession with testimony of Dr. Salomon concerning "this syndrome" and let the jury made a factual determination as to the weight to be given the confession. Trial counsel had serious doubts about a jury's finding Dr. Salomon's testimony credible. At the post-conviction hearing, trial counsel testified to the following:

> I thought he should plead guilty, correct, and I don't know if I told her [petitioner's wife] to talk him into it, but I, Mr. Waldron, from day one, told me he was guilty, that this had - - not - - that this had happened. He didn't think he was guilty on account it was consent. It was consensual sex between him and the child, but I explained all that to him from the very beginning and we were not

-8-

successful in suppressing his statement, and I felt certain that he should plead, enter a plea since the plea agreement offered 15 years which was the minimum amount of time that he would have to do, and I felt the jury would not find Dr. Solomon [sic] creditable [sic] if he was allowed to testify, but I also saw there might be a possible evidentiary problem getting his testimony in evidence, but it's been my experience people who confess to crimes, and that was the, that was the biggest part of this case against Mr. Waldron was he had testified to having sex with this child, and I felt that that was not going to overcome, he was not going to be able to overcome it.

Trial counsel was asked whether the petitioner ever gave him any indication that there was anything wrong with him, and counsel responded:

A. - - no, to the contrary. He called me, if I recall correctly, we went over this guilty plea petition in my office on a Saturday afternoon. We were over there hours, and he called me, and the guilty plea was sometime after that, and he called me after he signed it and said he never felt better in his life about what he had done. He had done the right thing, and talked about his grandfather would be proud of him for doing the right thing.

Q. That is making the decision?

A. Yes.

We conclude that trial counsel was not ineffective in not seeking forensic psychological evaluation or a competency hearing on the basis that petitioner was not competent when confessing to the crimes in the taped interview; or over the course of trial preparation and plea negotiations; or at the guilty plea submission hearing. Even if we were to conclude otherwise, the petitioner has failed to meet the second prong of the Strickland test, that is a showing of a "reasonable probability" that the outcome of the proceeding would have been different had it not been for counsel's deficiencies in performance. 466 U.S. at 694, 104 S. Ct. at 2068. As to the outcome of the suppression hearing, the facts of this case would not have warranted any outcome other than denial of the motion to suppress the taped interview. As to the failure of counsel to seek forensic psychological evaluation or a competency hearing, no evidence suggests that the petitioner was anything other than competent. Given the fact that the petitioner's mental condition at the time he engaged in the criminal sexual activity with SH was never an issue, the petitioner has failed to show that, but for the deficiencies of counsel, he would not have pled guilty but rather insisted on going to trial. See Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985) (holding that "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"). This issue is without merit.

## C. Failure to Properly Present Evidence
## and Law During Motion to Suppress

Petitioner finally contends that trial counsel was ineffective for failing to cite controlling law and to properly present evidence when arguing to the trial court that statements made during the interview with Detective Carter were inadmissible at trial because no Miranda warning had been given. The trial court correctly noted that the controlling case on this point is State v. Anderson, 937 S.W.2d 851 (Tenn. 1996). In Anderson, our supreme court held that "in determining whether an individual is 'in custody' and entitled to *Miranda* warnings, the relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Id. at 852. This objective assessment is highly fact specific. See id. at 855.

In this case, although counsel was not familiar with the specific holding of Anderson, he argued a number of the factors that the Anderson court cited as relevant to the objective assessment for determining whether an individual is in custody for purposes of Miranda. Trial counsel was able to shift his argument from whether petitioner was the focus of the investigation to whether petitioner considered himself to be in custody. Counsel argued that the words used by Detective Carter "tricked" the petitioner into thinking he was in custody by telling him that he could be arrested at any time. Counsel also noted that Detective Carter told the petitioner that the interview was not being recorded and that this was deceitful. The trial court stated the following:

> I have, first of all, listened to this interview. I have observed the witnesses that have testified here today, and I have observed their demeanor, including Mr. Waldron's, Detective Carter's, Dr. Salomon, and the other gentlemen [sic] who works with Mr. - - Mr. Bradford. I have determined that the defendant is an individual who was working; working in a leadership capacity; working at the time this interview took place. Detective Carter went to that interview. He did not tell the people where he worked who he was, but he clearly identified himself to Mr. Waldron and asked him to come to his car.

> He advised him no less than ten times that he was not going to arrest him, and, in fact, didn't arrest him. Mr. Waldron wasn't arrested until March of 1997, some almost six months after this interview.

> This conversation was taped so I'm able to make a determination of the tone of voice, the questions, the extent to which he was confronted or not confronted.

> I have determined, based on all of this, that this interview was not an in-custody interview. There was no need to advise him of his Miranda warnings, and it is clearly a voluntary statement.

-10-

We conclude that trial counsel's failure to recognize the holding in Anderson did not rise to the level of ineffective assistance of counsel. Even if we were to conclude otherwise, the evidence indicates that the petitioner was not in custody and that no ruling to the contrary could stand, therefore the petitioner has suffered no prejudice.

Based on the foregoing, we conclude that petitioner received effective assistance of counsel.

### Issue II. Responsibility of Trial Court and State to Order Forensic Psychological Testing or a Competency Hearing

Petitioner argues that both the trial court and the State erred in failing to order forensic psychological tests and/or a competency hearing so that petitioner's competence to plead guilty might be determined, given the fact that the petitioner was known to be under the care of a psychiatrist and taking certain medications.

In denying the petition for post-conviction relief, the trial court noted that the State is under no affirmative duty to demand a competency hearing in a criminal case, and further:

> Tenn. Code Ann. § 33-7-301 governs the procedure for evaluating an accused's mental competency. This section in part states that when a person is [sic] charged with a criminal offense is believed to be incompetent to stand trial, or there is a question of his mental capacity at the time the crime was committed, the Criminal Court Judge may, upon it's [sic] own motion or upon petition by the district attorney general or by the attorney for the defendant order the defendant to be evaluated. This statute is discretionary, since it does not require an examination. Graham v. State, 547 S.W.2d 531 (Tenn. 1977).
>
> . . . .
>
> The Court finds that the petitioner's decision not to seek a mental evaluation does not lead to the conclusion that the State of Tennessee was in any way required to request an evaluation of the petitioner. Additionally, the suppression hearing and the submission hearing did not give this Court any indication that the appellant was suffering from any mental impairment. The petitioner's answers to the Court's questions at the submission hearing were responsive and articulate. In short, the Court finds that the demeanor of the petitioner at the suppression hearing as well [as] at the submission hearing confirms that the petitioner was fully aware of what he was doing when he entered the pleas of guilty, and he had the requisite mental capacity to enter the pleas as well as waive his rights.

-11-

This court has determined that "[t]he test for determining if a defendant is competent to stand trial is whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him." State v. Johnson, 673 S.W.2d 877, 880 (Tenn. Crim. App. 1984) (citing Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)). This court has further determined that "[b]efore a mental evaluation is required, the evidence must be such as to warrant a belief that the defendant is incompetent to stand trial, or it must be sufficient to raise a question as to his mental capacity at the time of the crime." State v. West, 728 S.W.2d 32, 34 (Tenn. Crim. App. 1986) (citing Tenn. Code Ann. § 33-7-301 (Supp. 1986)).

Petitioner, in essence, argues that, even though his own counsel concluded that there was no basis for requesting a psychological evaluation or a competency hearing—a conclusion we have previously determined to have been reasonable under the facts of this case—the trial court and the prosecutor erred in not determining, on their own, that examination of the petitioner was necessary to fairly adjudicate this case. Petitioner cites two cases in support of his argument, asserting that both cases stand for the proposition that "the District Attorney has an obligation to request competency proceedings." Both cases, United States v. Love, 597 F.2d 81 (6th Cir. 1979), and United States v. Enoch, 650 F.2d 115 (6th Cir. 1981), deal with double jeopardy issues following a defendant's request for a mistrial. We disagree that the holdings in these cases suggest that the trial court and the prosecutor themselves have a responsibility, as the petitioner suggests, to investigate the competency of a defendant.

There is nothing in the evidence or in petitioner's argument to support his contention of error on the part of either the State or the trial court in failing to order forensic psychological evaluation or a competency hearing. This issue is without merit.

### Issue III. Voluntariness of Guilty Plea

The petitioner finally asserts that his guilty plea was not voluntary for two reasons: (1) mental impairment caused by medication made him unable to fully understand the rights he was waiving; and (2) his trial counsel coerced him into entering the guilty pleas against his will.

In determining whether a plea of guilty was voluntarily, knowingly, and intelligently entered, this court, like the trial court, must consider all relevant circumstances that existed at the entry of the plea. See State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A reviewing court may look to any relevant evidence in the record to determine the voluntariness of the plea. See id. The guilty plea process in Tennessee is controlled both by Rule 11 of the Tennessee Rules of Criminal Procedure and by case law, specifically, two decisions of our supreme court, State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), and State v. McClintock, 732 S.W.2d 268 (Tenn. 1987). Trial judges are required to adhere substantially to the procedure prescribed in Rule 11. A submission hearing transcript must establish on its face that the trial court substantially complied with the requirements of Rule 11, as well as the constitutional standard set out in Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the teachings of Mackey and McClintock.

First, as to mental impairment caused by the effect of medication, the post-conviction court stated the following:

> No evidence was offered at the post-conviction hearing, other than a print out of medication prescribed to the petitioner months prior to the plea, to show that the petitioner had been prescribed medication that should have been taken at the time of the guilty plea. Further, the Court remembers well the demeanor of the petitioner at the submission hearing. The Court's recollection was that the petitioner was articulate and appropriately responsive to questions asked of him. The Court did not observe any behavior on behalf of the petitioner that would alert the Court that the petitioner should have been or was taking medication. This observation coupled with the petitioner's responses at the submission hearing lead the Court to find that this claim is without merit. The claim that the petitioner's guilty plea was involuntary because the petitioner was under the influence of psychotropic drugs is therefore dismissed.

A careful review of the transcript of the guilty plea submission hearing shows it to have been precise and thorough. The colloquy between the trial court and the petitioner included the following as it relates to the use of medication:

> THE COURT: And are you taking any medication today?
>
> MR. WALDRON: No, ma'am, I am not.
>
> THE COURT: Suffering from any kind of condition that would interfere with your ability to understand what you are doing?
>
> MR. WALDRON: No, ma'am.

Later, at the post-conviction hearing, the petitioner was questioned by his counsel concerning these responses:

> Q. Judge Blackburn asked you next, Are you taking any medication today?
>    No, ma'am, I am not.
>    Was that truthful?
>
> A. Pardon me?
>
> Q. Were you taking any medication the day the plea - -
>
> A. I was instructed to answer that with a no.

-13-

Q. But at that time, were you taking, you were under the care of a doctor and taking medication?

A. Yes, I was. I took my medicine that day just like I always have, with my son.

The post-conviction court further questioned the petitioner:

THE COURT: Mr. Waldron, I just have one question, and that is you complain that I didn't, and speak into the microphone.

You complain that I didn't, that I accepted your guilty plea in spite of the fact that you were incompetent because you were on medication, but when I specifically asked you if you were taking any medication, you lied to me.

A. (WITNESS): No, ma'am, I did not lie to you.

THE COURT: Well, were you taking medication?

A. (WITNESS): The record, the transcript - -

THE COURT: No, no, answer my question. Were you taking medication when you stood over there and pled guilty?

A. (WITNESS): Yes, I was taking medications.

THE COURT: Okay. When I asked you if you were taking any medication, you told me no.

A. (WITNESS): I was asked the question, are you under the influence of drugs or alcohol today? That is the question that I was asked, Your Honor. The transcript does reflect that you asked, are you under the influence of medications today, or taking medications today.

THE COURT: No. The question, page 126, line 9 says, Are you taking any medication today? Your answer, Mr. Waldron, on line 11 was, No, ma'am, I am not.

The petitioner continued to claim that trial counsel coerced him into answering as he did and also that the post-conviction court should have remembered that at the hearing on his motion to suppress, some six months prior to the guilty plea submission hearing, Dr. Salomon had testified that the petitioner was taking medication for depression and anxiety resulting from his interview with

Detective Carter. Yet no proof was ever offered concerning the specific medication petitioner was taking on the day of the guilty plea hearing or even if he was actually taking any medication or the supposed effect of any of the medications that petitioner may have been taking.[5] Regardless of the influence of his trial counsel, if the petitioner had wanted the jury trial that he now claims was his desire all along, he was certainly given every opportunity to tell the trial court that he was on medication and effectively scuttle his plea agreement with the State.

As to the claim that the petitioner was coerced by threats of his trial counsel into entering a guilty plea against his will, the petitioner described that threat in the following way:

> He threatened me with you can get another attorney. I won't have nothing to do with this case. A week before my trial, I had no money to hire another lawyer, he said you can have one choice only. You can pick a hundred years or you can pick fifteen years.

The following exchange between the petitioner's wife and the post-conviction court occurred:

> THE COURT: Ms. Waldron, I believe I noted that you said [trial counsel] told you when you were in the hallway that you needed to let your husband make his own decision; was that what you said?
>
> A. (WITNESS): That is correct.
>
> THE COURT: Okay, so [trial counsel] was telling you to let your husband decide; is that correct?
>
> A. (WITNESS): In so many words; yes.

In ruling on this issue, the post-conviction court stated the following:

> The Court noted on the record during the submission hearing that the petitioner signed the plea petition four days before the actual submission hearing took place. The reason for this, according to the testimony of [trial counsel] at the post-conviction hearing, was that he [trial counsel] and the petitioner went over the petition in [trial counsel's] office in detail. The testimony of [trial counsel] at the post-conviction hearing was that they went over the plea petition for hours in [trial counsel's] office. [Trial counsel] further testified that after signing the petition, the petitioner phoned [trial counsel] and

---

[5]The guilty plea submission hearing was held on March 4, 1998. The pharmacist's statement from CVS Pharmacy showed that petitioner filled three prescriptions in 1998: (1) a prescription for Wellbutrin for thirty tablets on January 7, 1998; (2) a prescription for Remeron for thirty tablets on January 7, 1998; and (3) a prescription for Risperdal for sixty tablets with three refills on January 13, 1998.

-15-

told [trial counsel] that he (petitioner) was glad and that it was the best decision. Further, [trial counsel] testified that in the same phone call the petitioner confided that the petitioner's grandfather would be proud of his decision. [Trial counsel] also testified that the petitioner had always been able to assist in his defense and that in addition to discussing the guilty plea with the petitioner, [trial counsel] discussed the plea at length with the petitioner's wife. The Court finds [trial counsel] to be more credible on this issue than the petitioner.

We agree with the post-conviction court and conclude that the record unquestionably establishes that the petitioner's guilty plea was constitutionally valid in that it was voluntarily, knowingly, and understandingly made. This issue is without merit.

## CONCLUSION

We conclude that petitioner received effective assistance of counsel, that neither the State nor the trial court erred in failing to request forensic psychological evaluation of the petitioner or a competency hearing, and that the petitioner entered a constitutionally valid guilty plea. The judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE