IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

JANUARY 2000 SESSION

FILED

March 6, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # E1999-00253-CCA-R3-CD |
| Appellee, | * | BRADLEY COUNTY |
| VS. | * | Hon. Carroll L. Ross, Judge |
| CHARLES EDWARD OVERBY, | * | (Possession of Marijuana, Theft under $500, Theft over $1,000, Aggravated |
| Appellant. | * | Assault, and Second Degree Murder) |

For Appellant:

Charles G. Wright, Jr.
Attorney
253 East Eleventh Street
Chattanooga, TN 37402-4225

For Appellee:

Paul G. Summers
Attorney General and Reporter

Elizabeth B. Marney
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243

Sandra C. Donaghy
Assistant District Attorney General
P.O. Box 1351
Cleveland, TN 37364

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

<u>OPINION</u>

The defendant, Charles Edward Overby, was convicted of possession of marijuana, theft under $500.00, theft over $1,000.00, aggravated assault, and second degree murder.  The jury acquitted the defendant of aggravated burglary. The trial court imposed sentences as follows:

| Offense | Sentence |
| --- | --- |
| Possession of Marijuana | Eleven months, twenty-nine days (75%) |
| Theft under $500.00 | Eleven months, twenty-nine days (75%) |
| Theft over $1,000.00 | Eight years (Range II) |
| Aggravated Assault | Ten years (Range II) |
| Second Degree Murder | Twenty-five years (violent offender) |

The trial court ordered that the 10-year sentence for aggravated assault and the 25-year sentence for second degree murder be served consecutively.  All other sentences were ordered to be served concurrently for an effective sentence of 35 years.

In this appeal of right, the defendant argues that the trial court committed error by allowing an expert witness in psychiatry and psychology to testify directly on the ultimate issue of insanity.

We find no error and affirm the judgment of the trial court.

Shortly after 3:00 P.M. on June 3, 1997, Thomas Kevin Swinford, the 22-year-old son of Sergeant Thomas Keith Swinford of the Georgia Department of Natural Resources, looked out of his bedroom window and saw "my dad's car shoot through the yard, through the ditch, and up the street toward the dead end." Sergeant Swinford, a conservation ranger, was not at home at the time so the younger Swinford ran to the edge of the driveway, where he saw a shirtless, black-haired man, whom he later identified as the defendant, driving a 1993 Crown Victoria automobile that had been assigned by the state to his father.  The value of

2

the vehicle was estimated at $7,500.00.

An .870 shotgun, an AR-15, and several hundred rounds of ammunition were in the trunk of Sergeant Swinford's vehicle. There was a .38 caliber pistol, loaded with five rounds, in a holster under the seat. Hours after the theft, Sergeant Swinford received a radio report that the vehicle had been found at a residence in Bradley County, which borders Georgia. When Sergeant Swinford arrived at the scene, other officers had already placed evidence tape around his vehicle. Sergeant Swinford discovered that the two long guns were still in the trunk, but that the handgun was missing.

Roy Grant Breedlove, age 17 on the date of the theft, was cleaning his car when an official Georgia vehicle stopped at his Bradley County residence. The driver, whom Breedlove identified at trial as the defendant, inquired whether his father was at home and asked to use the phone. Breedlove went inside his residence and returned to the car with a portable telephone. Breedlove described the defendant as shirtless and "tired or strung out" from the look in his eyes. He recalled that the defendant then offered him some marijuana. When Breedlove refused, the defendant "went on his way." At trial, Breedlove described the defendant's driving as "fine."

Breedlove's mother, Irene Breedlove, was at their Bradley County residence at the time the defendant stopped at the home. About 15 minutes after the defendant left, Ms. Breedlove's husband returned to the residence. At 4:15, the couple left the residence in their vehicle and saw the defendant driving the Georgia state vehicle. Mr. Breedlove stopped and motioned the defendant to stop along the side of his car. Mr. Breedlove then asked the defendant if he had just been at his house. When the defendant answered in the affirmative, Mr. Breedlove said, "Well, don't be back on my property again." The Breedloves then took the license tag number of the defendant's vehicle and gave the information to the sheriff's department.

3

Tana King testified that she knew the defendant and his son, Charles Overby, Jr., who was a friend of her son Christopher, age 15 at the time of the crimes. When asked if she had ever known the defendant to "suffer from any form of mental illness" or to "abuse drugs," Ms. King replied in the negative.

Jamie Fowler was at the residence of the victim, Roy Allen Hampton, on the date of the car theft. Fowler and the victim had gone to school together and had worked together at a carpet mill for about four years. They were working on Fowler's vehicle at the victim's home when Fowler saw a Georgia state vehicle pass by the residence and then return a few minutes later. The defendant, who was wearing no shirt, drove the vehicle partly into the Hampton driveway, pointed a handgun at the two men, and asked, "Where's my kids at?" The victim answered that the residence was his and that there were no kids there. The defendant insisted that he "knew they were there" and persisted in his inquiry. Then, while only a few feet away, the defendant fired a shot into the head of the victim, causing his eventual death. Fowler identified the defendant as the person who shot the victim. Fowler testified that after the shooting, the defendant stepped out of his car, pointed the gun at him, and directed him to the back of the victim's residence. Fowler then escaped around the corner of the house, went inside, and called 911. Fowler informed the victim's grandfather, who was inside the Hampton residence, of what had occurred and loaded a shotgun in case the defendant tried to force his way into the residence. Fowler explained that he had never seen the defendant on any prior occasion. At trial, he testified that there were no words of provocation exchanged between the defendant and the victim at any time before the shooting.

Robbie Steward, who lived in the same neighborhood as the defendant, testified that the defendant, whom she described as shirtless, sweaty, and out of breath, also came to her residence on the day of the murder looking for his sons, Charles and Sam Overby. Ms. Steward testified that the defendant's sons often played with her son, Brock Steward. Ms. Steward told the defendant his sons "might be across the street" where her mother lived. Later, Ms. Steward saw the

4

defendant on TV. He was wearing a shirt owned by a friend of her son's who had been in the Steward garage on the day before the offense.

George Howard, who lived across the street from Ms. Steward, was working in his garden when he saw the defendant walking through high weeds. Howard asked, "Hey, where are you going?" The defendant answered, "My van tore up . . . [and] I'm going down to get it if it's okay." Howard recalled nothing peculiar about the defendant. He specifically recalled that the defendant was not unruly and did not slur his speech.

Later, Billy McBryar had been for a drive with his wife, his granddaughter, and his two great grandsons when he returned to his residence, where his granddaughter's van was parked. His granddaughter opened the door of the van, jumped back, and exclaimed, "Papaw, there's a man in my van." McBryar then saw the defendant "hunkered down in the van" and asked him for an explanation. The defendant answered, "I'm waiting on the man in the house to take me across town." McBryar described the defendant's demeanor and attitude as "real quiet." He recalled that the defendant was perspiring heavily from the heat, was wearing a damp shirt, and was wet from the knees down. McBryar said, "Since nobody knows you and I don't know you, it would be best for you to get out of the van and hit the road." The defendant followed McBryar's directive and walked west on Spring Place Road.

Lieutenant Mike Boggess of the Bradley County's Sheriff's Office was dispatched to investigate a suspicious person in the Spring Place Road area. When he searched the area, he saw the defendant walking along Bromley Drive, followed by three or four dogs. Lieutenant Boggess patted the defendant down but found no weapon. He described the defendant as hot and sweaty and wearing a gray shirt and muddy blue jeans wet from the knees down. Lieutenant Boggess checked the defendant's identification, made radio contact with the dispatcher, and received instructions to arrest the defendant. The defendant, who had some cuts and

scratches, did not resist.  A gunshot residue test on the defendant established that he had recently fired a gun.  Several months later, the murder weapon was found in a hollow spot of a tree in a rural area not far from the crime scene.  There were several bullets in the gun.

Detective Clint Denny of the Bradley County Sheriff's Department identified a small bag of marijuana taken from the stolen vehicle.  He and Officer Jimmy Woody took several photographs of the stolen vehicle at the crime scene.  Detective Denny also identified a note found in the stolen vehicle which was apparently written by Charles Overby, Jr., and left with the defendant:

> Daddy, went with Chris to James' house.  Call Tom's
> Cycles and talk to Tom.  Also call Annette.  Be back
> soon, Charles.

Detective Denny also placed a shirt into evidence that was worn by the defendant at the time of his arrest.

Dr. Charles Harlan performed the autopsy on the victim.  It was his opinion that the victim was unconscious immediately upon being shot.  He died several hours later.  Upon direct examination, Dr. Harlan was asked whether methamphetamine would affect one's ability to distinguish right from wrong.  Dr. Harlan answered, "No," as defense counsel objected to the testimony on the basis that the answer qualified as an opinion on the ultimate issue of the case.  The defense argued that Tenn. Code Ann. § 39-11-501(c) prohibited testimony about the criteria establishing the test for insanity.  That is, (1) whether the defendant suffered from a severe mental disease or defect and (2) whether he was able to appreciate the nature or wrongfulness of his conduct.

Dr. William C. Greer, a psychiatrist at Valley Psychiatric Hospital, testified for the defendant.  After examining the defendant, Dr. Greer initially determined that he was suffering from major depression, probably recurrent.  He later modified his diagnosis to major depression with psychosis and mixed substance dependence or substance abuse.  His testimony was that psychosis was

6

a severe mental condition. Dr. Greer was unable to state whether the defendant was suffering from a psychosis other than one induced by amphetamines at the time of the crimes. Dr. Greer was also unable to state whether the defendant was aware of the wrongfulness of his act.

The defendant's sister, Violet Little, testified that the defendant was introverted and nervous as a child. She recalled that he would often claim to have heard his deceased father talking to him. She testified that the defendant attempted suicide in jail and, after his release on bail, had continued to make statements about the location of his children, often accusing her of having his children. Ms. Little described the defendant as being violent at times and cool and collected within minutes thereafter. She recalled that the defendant suffered a head injury as a child when he fell out of a car.

Barbara Sullivan, the defendant's mother, described the defendant as having been a quiet child. Ms. Sullivan, who stated that she had been treated for schizophrenia, anxiety, and depression, recalled that her son had suffered a head injury in an automobile accident when he was young. Although she had not seen him for about a month before the shooting, she described the defendant's behavior after his release on bail as bizarre.

Dr. Patrick Craven, a physician at Mocassin Bend Mental Health Institute, testified that the defendant stated that he heard voices that told him to commit suicide. While initially diagnosing the defendant as a paranoid-type schizophrenic, Dr. Craven ultimately concluded that the defendant had a schizo-effective disorder, depressed type.

Dr. David A. Rose administered the Minnesota Multiphasic Personality Inventory (MMPI) and the Rorschach Ink Blot Test. Dr. Rose indicated that the MMPI demonstrated evidence of chronic depression and apathy. It was his opinion that the defendant had serious cognitive difficulties and serious psychotic thinking.

7

Dr. Rose stated that the Rorschach test did not demonstrate psychotic thinking at the time of testing but did place the defendant in the marginal range, subject to a psychotic reactive pattern under stress. It was his opinion that the defendant was relatively paranoid, frightened, and very unrealistic in his thinking.

Dr. Samuel Craddock, a psychologist at the Middle Tennessee Mental Health Institute, described the defendant as a danger to himself due to threats to commit suicide. It was his opinion that the defendant had major depression with psychotic features. Dr. Craddock stated that the depression and the defendant's preoccupation with suicide interfered with his ability to appreciate the seriousness of the murder charge and to actively assist in the preparation of his defense. He recalled that the defendant was treated at his facility from March 24 to April 22, 1998, almost ten months after the crime. It was his opinion that the defendant was severely mentally ill at the time of the crime because of his voluntary ingestion of "appreciable amounts of amphetamines." He did, however, believe that the defendant had an appreciation of the wrongfulness of his criminal acts. "I and Dr. Faruch were of the opinion that Mr. Overby was severely mentally ill at the time of the incident. However, we felt as though this mental illness was induced as a result of him taking . . . appreciable amounts of amphetamines, which was also supported by him acknowledging it, as well as the data that was provided by the hospital's screening test."

Dr. Craddock testified that a text, The Diagnostic and Statistical Manual of Mental Disorders, mentions amphetamine dependence or amphetamine intoxication as a mental illness:

> So for me to say that it's not a mental illness is not completely accurate. But I want to remind the jury that this is something that was brought on by Mr. Overby, his voluntary taking the medication and not something like a depression or a schizophrenia or a psychosis that a person really can't control themselves.

He concluded that being "drunk on drugs" can be classified as a mental illness.

Dr. Craddock also testified as follows regarding the defendant's

8

involvement in the crimes:

> I think he had an appreciation of the wrongfulness of his alleged shooting of another individual and the accompanying other crimes with that. That is not something that one can measure directly by a psychological test, either at the time or sometimes later, but it can certainly be inferred by their behavior, meaning the defendant's behavior; such things as if they made an effort to evade being apprehended; if they tried to hide evidence, a gun or something of this nature, that would indicate that likely the person had an appreciation for the wrongfulness of his behavior . . . . Mr. Overby's delusion was that he was looking for his child, and his actions may have been totally irrational, but nonetheless I don't see that it deprived him of appreciating the wrongfulness of assaulting another . . . I believe that he was aware [that] the shooting was wrong.

Dr. Jerry DeVane, the medical director at the emergency room at Bradley Memorial Hospital, was unable to state whether the defendant suffered from a mental disease or defect on the date of the shooting. Dr. Angelina A. Supan, a psychiatrist at Mocassin Bend Mental Health Institute, diagnosed the defendant as having paranoid schizophrenia at the time of her examination. Dr. Supan had no opinion as to whether the defendant suffered from a severe mental disease or defect at the time of the murder.

The defendant testified that he had a car accident as a child and suffered a head injury. He stated that he had had problems with his memory and had heard voices for 14 to 15 years. The defendant testified that he utilized a radio with earphones in order to cover up the voices that he heard and also took medication. The defendant claimed that he did not want to live any longer. He acknowledged that he had been introduced to "crank" by a friend and had used it for eighteen days before the shooting of the victim.

> Until 1995, the statutory definition of insanity was as follows:
>
> Insanity.--(a) Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law.
>
> (b) As used in this section, "mental disease or defect"

9

> does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Tenn. Code Ann. § 39-11-501 (repealed 1995); see Graham v. State, 547 S.W.2d 531 (Tenn. 1977).  Moreover, until 1995, expert witnesses could testify to an ultimate issue, including that of the defendant's mental responsibility.  Tenn. R. Evid. 704.  In 1995, our legislature amended the insanity statute in its entirety, as follows:

> (a)  It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts.  Mental disease or defect does not otherwise constitute a defense.  The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b)  As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c)  No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a).  Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501 (emphasis added).  Although Rule 704, Tenn. R. Evid., was not amended to preclude expert testimony on the ultimate issue of insanity, the 1996 Advisory Commission Comments to the rules recognize that such testimony has been restricted under Tenn. Code Ann. § 39-11-501.  It is well established that a specific provision relating to a particular subject controls and takes precedence over a general provision applicable to a multitude of subjects. State v. Black, 897 S.W.2d  680, 683 (Tenn. 1995).

The United States Supreme Court has ruled that a state may require a defendant to prove the defense of insanity beyond a reasonable doubt without resulting in a denial of due process under the federal constitution.  Leland v. Oregon, 343 U.S. 790 (1952).  "It is axiomatic, therefore, that a lesser standard of proof, such as the clear and convincing standard, may be imposed."  United States v. Amos, 803 F.2d 419, 421 (8th Cir. 1986); see also United States v. Freeman, 804 F.2d 1574 (11th Cir. 1986).  In Freeman, the defendant challenged the burden of proving insanity by clear and convincing evidence under the Insanity Defense

Reform Act of 1984,[1] which is similar to our statute. The Eleventh Circuit held that the rule announced in Leland compelled a determination that the clear and convincing evidence standard was constitutional. 804 F.2d at 1576.

Obviously, the jury rejected the defendant's claim at trial that he had established his insanity at the time of the crimes by clear and convincing evidence. In this appeal, the defendant argues that the trial court "completely destroyed the defense of insanity . . . by first requiring experts to testify to their opinion of [his] sanity at the time of the offenses and then later . . . allowing experts to so testify." In fact, the trial court did rule that the experts could not testify on the sanity or insanity of the defendant but did allow questions regarding whether he had an illness and whether that illness prevented him from knowing the wrongfulness of his act. In our view, the trial court ruled correctly.

In State v. Jeffery L. Perry, No. 01C01-9710-CC-00467 (Tenn. Crim. App., at Nashville, Apr. 22, 1999), perm. to app. denied, Oct. 11, 1999, this court upheld the constitutionality of Tenn. Code Ann. § 39-11-501. This court ruled that construction of subpart (c) should be narrow because of the interests at stake:

> Although subpart (c) precludes an expert from testifying that the defendant was, in fact, legally "insane" at the time of the commission of the offense, the expert may testify that the defendant suffered from a severe mental disease or defect. The expert may also state whether the defendant could have appreciated the nature or wrongfulness of his conduct at the time of the offense. Subpart (c), however, does prevent the expert from

_____

[1] (a) Affirmative defense.---It is an affirmative defense to the prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) Burden of proof.---The defendant has the burden of proving the defense of insanity by clear and convincing proof.

11

> stating that the severe mental disease or defect operated to prevent the defendant from appreciating the nature or wrongfulness of his conduct. In that regard, the jury must render the ultimate determination as to the effect of mental disease on the defendant's understanding of his conduct at the time of the offense.

Perry, slip op. at 34.

None of the witnesses testified that the defendant met the two-pronged statutory test for insanity. That is, none testified that because of "a severe mental disease or defect" the defendant was "unable to appreciate the nature or wrongfulness" of his acts. Our review suggests that the trial court used care in fashioning a process by which the various expert witnesses could express a view either on the nature of the defendant's mental disease or defect, even if due to excessive use of methamphetamines, or his ability to appreciate the wrongfulness of his acts. To do so was entirely proper under the new statute. Comments upon the criteria necessary to establish insanity are not comments on the ultimate issue. That the defendant was unable to establish by clear and convincing evidence that he was insane at the time of the offense does not mean that the trial court did not provide him with the opportunity to do so. In our assessment, the terms of Tenn. Code Ann. § 39-11-501(c) were not violated. The defendant had an opportunity to establish his insanity defense. The supporting proof was simply inadequate to meet his burden. The experts did not render an opinion on the ultimate issue, that is, the sanity or insanity of the defendant.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:


_____
Joseph M. Tipton, Judge


_____

12

James Curwood Witt, Jr., Judge