# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. JEFFREY SCOTT PETTY

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR8703     Robert E. Burch, Judge**

---

**No. M2009-01621-CCA-R3-CD - Filed February 12, 2013**

---

The Defendant-Appellant, Jeffrey Scott Petty, was convicted by a Dickson County Circuit Court jury of first degree felony murder and arson and was sentenced to consecutive sentences of life imprisonment and five years, respectively.  On appeal, Petty argues that the trial court committed plain error by instructing the jury that his statement to law enforcement was a confession rather than an admission against interest.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Robert Brooks, Memphis, Tennessee (on appeal); William (Jake) Bradley Lockert, III, District Public Defender; Dawn S. Kavanagh, Assistant Public Defender; and Rhonda R. Crabtree, Ashland City, Tennessee (at trial), for the Defendant-Appellant, Jeffrey Scott Petty.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Dan Mitchum Alsobrooks, District Attorney General; Carey J. Thompson and W. Ray Crouch, Jr., Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On June 30, 2006, a body was discovered in a burning trailer located at 1208 Wolf Branch Road, Vanleer, Tennessee.  The body of the victim was later identified as Kenneth Brake.  An expert determined that the victim's cause of death was a gunshot wound to the back of the head and that the victim was dead at the time the fire started.

On July 3, 2006, Petty gave his first statement to law enforcement, which was recorded and reduced to writing. In this statement, Petty admitted that he had lived in the trailer located at 1208 Wolf Branch Road but was forced to move out in January 2006 because he had gotten injured at work and fell behind on his bills. He stated that he had no issues with the victim, who owned the trailer. Petty initially said that the last time he had been to the area of the victim's trailer was when he moved out of the trailer in January 2006. However, he later said that the last time he had been to this area was three weeks prior to giving the statement. He also said that he had recently bought a Jeep and was having trouble making payments on it. Petty stated that he had been with James Cheaves or at Cheaves's house on Wednesday, June 28, 2006. On June 29, 2006, Petty said that he got some food at Krystal's before falling asleep in his Jeep in the driveway of a friend's house. When he awoke the morning of June 30, 2006, he returned to his father's house and stayed there. Petty denied being in the area of the victim's trailer on June 30, 2006 and denied that he had recently pawned any property. Petty gave a second statement on July 6, 2006, for the purpose of resolving some discrepancies in his June 3, 2006 statement.

Petty gave a third statement to law enforcement, which was recorded and transcribed, on July 12, 2006. He also signed a written statement on July 12, 2006. Petty stated that on June 29, 2006, he talked to Thomas Dotson while Dotson was at work at Krystal's, and they decided that they were going to rob the victim because Dotson needed money to purchase a vehicle. Petty picked up Dotson at work at approximately 10:30 p.m. They arrived at the victim's trailer at 1208 Wolf Branch Road around 1:00 a.m. on June 30, 2006. Dotson looked around the trailer for thirty minutes. When Dotson tried to persuade Petty to rob the victim, Petty refused. Dotson retrieved a sawed-off, single shot shotgun and entered the trailer while Petty stayed outside. Petty said that Dotson had brought the shotgun with him and that he did not know where Dotson had gotten the gun. Approximately ten minutes after Dotson entered the trailer, Petty heard a gunshot and started running for his Jeep before he fell down on a gravel pile. Petty observed Dotson take two gasoline cans from the victim's front porch and pour gasoline in the inside the trailer before lighting a piece of paper and tossing it inside. He saw flames coming from the victim's living room. Then Dotson ran to the Jeep with what he believed was a nine millimeter handgun in his hand. Petty and Dotson got into Petty's Jeep and drove back to Dotson's house. During the trip, Dotson told Petty that he had "wasted" the victim by shooting him one time. Dotson told him that he had believed that the victim was asleep at the time he entered the trailer because he had seen the victim's prosthetic leg through the trailer's window. However, when Dotson entered the trailer through the back door, the victim pulled out a nine millimeter handgun, and Dotson shot him with the shotgun. Dotson then grabbed the victim's handgun, a box of shells, and approximately one hundred dollars out of the victim's wallet. Petty stated that Dotson gave him ten or fifteen dollars for gas from the money Dotson had taken from the victim. When they arrived at Dotson's house, they "sat around thinking." Then Dotson telephoned his

girlfriend, Lauren, and Petty went to sleep in his Jeep. Petty said that Dotson gave the box of shells away when he got rid of the nine millimeter gun. He said that law enforcement should find a few shells from the victim's gun on the pool table at Dotson's home. Petty admitted that he knew that the victim had some valuable property but asserted that he never took anything because he did not want to steal from him. Petty was arrested following his third statement.

After arresting Petty, law enforcement arrested Dotson, a minor. A search of Dotson's basement revealed two live rounds of nine millimeter ammunition and a blackened, empty box of nine millimeter ammunition. A later search of Dotson's entire home revealed a spent 410 Winchester Number 8 shotgun shell in a closet and a second spent shell hidden in a drawer.

When law enforcement searched Petty's car, they found a Walmart receipt showing the purchase of a box of shotgun shells just after midnight on June 30, 2006. A surveillance video from Walmart showed that Petty was with Dotson and Cheaves at the time Petty purchased the Winchester AA 410 shotgun shells, Number 8 shot. The video also showed Petty, Dotson, and Cheaves leaving Walmart at approximately 12:06 a.m. on June 30, 2006. After receiving information that evidence in the case might have been hidden in the woods behind Dotson's house, law enforcement searched this area and found a white Walmart bag with approximately twenty medicine bottles prescribed to the victim. Some of the bottles contained pills, and some were empty.

In July 2006, law enforcement recovered coins in collector books which Petty had sold to another individual. In November 2006, law enforcement recovered 111 coins that Cheaves had given to Roman Sensing. Although law enforcement received information that the sawed-off portion of the shotgun had been discarded in an area in Charlotte, Tennessee, the barrel was not recovered.

Jonathon Lott, who was dating Cheaves's sister at the time of the crime, said that Cheaves asked him to discard a bag containing pieces of a gun a couple of weeks after the victim's death. He threw this bag out of his truck window while he was in Greenwood, Mississippi, picking up another vehicle. He said he did not know that he was discarding a murder weapon at the time. He later told law enforcement about the bag and helped them find the trigger and the housing of the murder weapon. Lott said that he went with Petty and Cheaves when they sold the coins in Dickson. He said that Cheaves began wearing a blue bandana after the victim's death.

Josh Yates, who attended school with Petty, Dotson, and Cheaves, informed law enforcement that he saw a sawed-off 410 shotgun in Petty's Jeep Cherokee a couple of weeks

before the victim was killed. He also saw some shotgun shells in the Jeep. The night the victim was killed, Yates said that he saw Petty and Cheaves at Cheaves's home and that Petty told him that they were going to rob someone. Yates informed them that they were crazy and returned home. After he discovered that the victim had died, Petty told him that they had robbed someone and had gotten "a few guns," Yates observed a flat screen television in the back of Petty's Jeep and a laptop computer at Cheaves's house. He said he traded Roman Sensing an amplifier for the laptop computer. At the time, Sensing and Cheaves had told Yates that the laptop computer belonged to Petty, who kept it at his grandmother's house. Yates said he went with Petty and Cheaves to Dickson, where they sold coins to a coin collector.

Yates said that the last time that he saw the sawed-off shotgun was at Cheaves's house sometime after June 30, 2006. He said that Cheaves pulled the shotgun out of a shed near his house before taking it to a nearby field to try to burn it. He said Cheaves was able to burn the stock of the gun but not the metal parts of the gun. Later, Yates saw Petty throw the sawed-off barrel of the shotgun out of his Jeep. Yates said that Cheaves and Sensing gave him some pills, which he consumed. He stated that he did not know that the pills belonged to the victim.

Roman Sensing, who went to school with Petty, Dotson, and Cheaves, said that the day after the victim was killed, he, Petty, Dotson, and Cheaves got into Petty's Jeep and drove by the victim's property. When they passed the trailer that had burned, Petty told him that he, Dotson, and Cheaves had killed the victim and had set the victim's trailer on fire. Petty said that Dotson entered the trailer and shot the victim once in the chest with a shotgun before exiting the trailer and ejecting the shell. Because the shot to the victim's chest did not kill the victim, Dotson re-entered the trailer and shot the victim in the head. Petty told Sensing that they robbed the victim and took all of his valuable items before setting his trailer on fire with gasoline that was in cans on the trailer's front porch. Sensing said he saw the laptop, coins, pills, and flat screen television, which Petty said came from the victim's house. Sensing also said that Petty, Dotson, and Cheaves had taken some tools from the victim, but he did not know the current location of these tools. Petty told Sensing that they had also taken a handgun from the victim, which was in Dotson's possession. Because Petty owed Sensing money, Petty gave Sensing the laptop, which Sensing then traded to Yates for an amplifier. Sensing also went with Petty, Dotson, and Cheaves when they sold the victim's coins. Sensing had some of the victim's coins in his possession, and he gave these coins to law enforcement. He also obtained some of the victim's pills, which he consumed. Sensing said that after the victim's death Petty and Cheaves began wearing blue bandanas, which Petty told him was a "gang thing" that meant that you had killed someone. Sensing also said that shortly after the victim's death, he saw Cheaves attempting to burn the sawed-off shotgun used to kill the victim.

Jordan Sowards, who went to school with Petty, Dotson, and Cheaves, stated that he had seen a shotgun in the basement of Dotson's home. Soward said the shotgun was a single barrel gun that had scratches on the barrel. Petty had told him that the gun had scratches on the barrel because they were trying to make it into a sawed-off shotgun.

Karen Hall, the victim's friend and neighbor, stated that the victim originally owned a house and a trailer on his property. However, on March 14, 2006, a fire burned the victim's house. The victim asked Hall to go to the trailer on his property, where she saw Petty and his girlfriend standing on the trailer's front porch. Hall said she told Petty that he would have to move out of the trailer so that the victim could live there. A short time later, the victim moved into the trailer. Hall said the victim showed her a check for over fifty thousand dollars from the insurance company to cover the fire damage to his house. Hall said that Petty was known to tell everyone about his personal business. She said that the victim owned handguns, long guns, and two laptops.

Evidence was admitted showing that the victim had purchased a flat screen television and a laptop after his house burned. In addition, evidence was admitted showing that the victim had a coin collection and numerous guns. None of these items were found at the scene of the trailer fire. The victim's flat screen television was found at Cheaves's father's house.

Danny Vaden, a special agent with the State of Tennessee's Bond and Arson Investigation section, stated that the fire at the victim's trailer was caused by an accelerant like gasoline. Special Agent Vaden believed that the fire started when someone poured gasoline into the center of the trailer.

## ANALYSIS

Petty argues, for the first time on appeal, that the trial court committed plain error by instructing the jury that his statement to law enforcement was a confession rather than an admission against interest. He asserts that because his position at trial was that his third statement to authorities was true, "[t]he trial court's erroneous instruction left the jury with no alternative but to convict the defendant as charged." The State responds that Petty has waived this issue by failing to request the admission against interest jury instruction and by failing to include it in his motion for new trial. The State also argues that Petty has failed to demonstrate that the trial court committed plain error regarding the confession jury instruction. We agree with the State.

Here, the trial court provided the following instruction regarding confession to the jury:

Evidence of a confession has been introduced in this case. A confession is a statement by the Defendant that he engaged in conduct, which constitute[s] the crime charged[,] and it is acknowledgment of guilt in itself.

The Court has ruled that the confession is admissible in evidence, but it is your duty to judge its truth. In so judging, you should consider the circumstances under which a confession was obtained, as well as any evidence which contradicts all or any part of the statements made.

You must consider all the statements made by the Defendant, whether favorable or unfavorable to him. You must not disregard any of them without good reason. If the evidence in this case leads you to believe that the confession of any part of it is untrue or was never made, you should disregard it or that portion which you do not believe.

You are the sole judges of what weight should be given to the portion of the confessions that you believe and you should consider them along with all the other evidence in the case in determining the Defendant's guilt or innocence.

The aforementioned instruction directly follows the language contained in Tennessee Pattern Jury Instruction - Criminal 42.12.

Here, Petty failed to request the statement against interest jury instruction at trial and filed an untimely motion for new trial, which failed to include the issue regarding the allegedly erroneous jury instruction. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. Crim. P. 33(b) ("A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered."); Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Consequently, this issue is waived unless the trial court committed plain error.

Petty argues that the trial court's instruction to the jury that his statement was a confession rather than an admission against interest amounts to plain error. We disagree. The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. It follows that a Defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

Petty takes issue with the following portion of the jury instruction: "Evidence of a confession has been introduced in this case. A confession is a statement by the Defendant that he engaged in conduct, which constitute[s] the crime charged[,] and it is an acknowledgment of guilt in itself." When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn.

2005)); see State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)). We conclude that the jury instruction on confession in this case fairly submitted the legal issues and contained a proper statement of the applicable law. See Majors, 318 S.W.3d at 864-65. Therefore, Petty has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error was necessary to do substantial justice. Because Petty failed to establish all five factors required for plain error, he is not entitled to relief. See Smith, 24 S.W.3d at 282. The trial court's judgments are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE